Evelyn **HEINRICH** on behalf of her Husband George Heinrich, Henry M. Sienkewicz, Jr., on behalf of his Mother Eileen Rose Sienkewicz, Rosemary Gualtieri on behalf of her Father Joseph Mayne, Walter Carl Van Dyke on behalf of his Father Walter Carmen Van Dyke and All Others Similarly Situated, Plaintiffs,

v.

William H. **SWEET**, M.D., Trustee of the Lee Edward Farr Trust dated 1/11/71, as amended, The Estate of Lee Edward Farr, M.D., Associated Universities, Inc., Massachusetts General Hospital, Massachusetts Institute of Technology, and The United States of America, Defendants.

No. Civ.A. 97–12134–WGY.

United States District Court,
D. Massachusetts.

Aug. 16, 1999.

Raymond J. Heslin, Gold, Farrell & Marks, New York City, Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, DC, John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, Anthony Z. Roisman, Lyme, NH, for plaintiffs.

Raymond J. Kenney, Christopher J. Maley, Gail A. Anderson, Martin, Magnuson, McCarthy & Kenney, Boston, MA, for William H. Sweet, M.D., Massachusetts Gen. Hosp., defendants.

William Shields, Sarah G. Hunt, Day, Berry & Howard, Boston, MA, Kevin T. Van Wart, Jerome A. Karnick, Marc J. Zwillinger, Jonathan Silverman, Kirkland & Ellis, Chicago, IL, for Lee Howard Farr, M.D., Associated Universities, Inc., defendants.

Francis C. Lynch, Lori B. Silver, Constantine Athanas, Palmer & Dodge, Boston, MA, Owen Gallagher, Garrett Harris, Sally A. VanderWeele, Gallagher & Gallagher, P.C., Charlestown, MA, for Massachusetts Institute of Technology, defendant.

Burke M. Wong, U.S. Department of Justice, Washington, DC, for USA, defendant.

Herbert E. Milstein, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Walter Carl Van Dyke, Representative of the Estate of Walter Carmen Van Dyke, plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. *Introduction.*

This cause of action arises out of experiments conducted on individuals under the care of Massachusetts General Hospital and Brookhaven National Laboratory in the 1950's and 1960's. In the Second Amended Complaint (the "Complaint"), the plaintiffs (collectively, the "Plaintiffs") allege that various doctors, institutions, and the United States government conspired to conduct "extensive, unproven and dangerous medical experiments on over 140 terminally ill patients, without their knowledge or consent." Dkt. # 21 at ¶ 2. The Plaintiffs seek redress from Lee Farr, M.D., and Associated Universities, Inc. (together, "Associated Universities"); William H. Sweet, M.D., and Massachusetts General Hospital (together, "Mass General"); the Massachusetts Institute of Technology ("MIT"); and the United States.

This action has already been the subject of two written orders by this Court. *See Heinrich v. Sweet,* 44 F.Supp.2d 408 (D.Mass.1999) ("*Heinrich I* "); *Heinrich v. Sweet,* 49 F.Supp.2d 27 (D.Mass.1999) ("*Heinrich II* "). Before the Court now are a variety of dispositive motions filed by the various defendants:

(a) A motion for partial summary judgment brought by MIT regarding the applicability of the Price–Anderson Act;

(b) A motion to dismiss and a motion for judgment on the pleadings brought by Associated Universities and Mass General, respectively, arguing that the Plaintiffs' state law causes of action are time-barred under applicable statutes of limitations;

(c) Motions by each of the private defendants seeking either dismissal or judgment in its favor on the *Bivens* count of the Complaint, arguing that the Court cannot consider the private defendants to be federal actors for purposes of the *Bivens* claim or, alternatively,

that the Plaintiffs have not stated a constitutional violation sufficient to support a *Bivens* claim; and

(d) A motion to dismiss for lack of subject matter jurisdiction brought by the United States arguing that it cannot be held liable under the Federal Tort Claims Act due to the independent contractor and discretionary functions exceptions, *see* 28 U.S.C. §§ 2671, 2680(a).

Because these various motions are factually related and legally interdependent, the Court has reserved judgment on them until such time that they could all be addressed simultaneously. That time has arrived.

## II. *Factual Background.*

A complete factual description of the case is provided in *Heinrich I* and *Heinrich II*. The following background will focus on those facts relevant to the instant motions.

### A. *The Formation of Associated Universities.*

Associated Universities was incorporated as a private, non-stock, educational and research institution under the laws of the state of New York on July 18, 1946. *See* Dkt. # 81, Ex. 1. The corporation was formed "[t]o acquire, plan, construct and operate laboratories and other facilities, either under contract with the Government of the United States or its agencies or otherwise, for research, development and education in the physical and biological sciences, including all aspects of the field of nuclear energy and its engineering and other applications, and to educate and train technical, research and student personnel. . . ." *Id.* at 1. Additionally, Associated Universities was intended to act as "an agency through which universities and other research organizations will be enabled to cooperate with one another, with the Government of the United States and with other organizations toward the support and use of laboratories and other research facilities and toward the development of scientific knowledge. . . ." *Id.* As-

sociated Universities was founded by Harvard, Yale, Columbia, Cornell, Princeton, MIT, Rochester University, Johns Hopkins, and the University of Pennsylvania. *See* Dkt. # 21 at ¶ 26. It is governed by a self-perpetuating Board of Trustees that consists of representatives from each of the member universities. *See* Dkt. # 81, Ex. 1; *id.,* Ex. 4 at v.

### B. *The Establishment of Brookhaven National Laboratory.*

On December 23, 1947, Associated Universities entered into a contract with the United States to administer Brookhaven National Laboratory ("Brookhaven") in Upton, New York. *See id.* at Ex. 3. Associated Universities was to "organize, operate and maintain Brookhaven . . . for the conduct of studies, experimental investigations and tests," including "[t]he conduct of research and development in the atomic and related fields described in Section 3 of the Atomic Energy Act. . . ." *See id.* at 2, 4. Section 3 of the Atomic Energy Act directed the Atomic Energy Commission (the "Commission") "to exercise its powers in such manner as to insure the continued conduct of research and development activities . . . by private or public institutions or persons and to assist in the acquisition of an ever-expanding fund of theoretical and practical knowledge . . . ," including the "utilization of fissionable and radioactive materials for medical, biological, health, or military purposes. . . ." Atomic Energy Act of 1946, Pub.L. 79–585, § 3, 60 Stat. 755 (1946). Section 3 also instructed the Commission that any research conducted "shall contain such provisions to protect health, to minimize danger from explosion and other hazards to life or property, and to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine. . . ." *Id.*

### C. *The Relationship Between Associated Universities and the Commission.*

Brookhaven itself is not a legally cognizable entity. The land, fixtures, equip-

ment, and other property constituting the physical manifestation of Brookhaven were directly owned by the United States. *See* Dkt. # 81, Ex. 3 at 3, 11. The operation and management of Brookhaven, as well as all of the research and experimentation performed there, was provided by Associated Universities on an independent contractor basis. *See id.* at 2. This organizational structure was necessitated by the fact that, under the Atomic Energy Act of 1946, only the Commission could own a nuclear reactor that was capable of "producing within a reasonable period of time a sufficient quantity of fissionable material to produce an atomic bomb or other atomic weapon" and only the Commission could own fissionable materials. Atomic Energy Act of 1946, §§ 4, 5.

The Director of Brookhaven was an employee of Associated Universities and reported to the Board of Trustees. *See* Dkt. # 81, Ex. 4 at Fig. 3. In return for providing its services, Associated Universities received a management fee plus the "costs and expenses" of work performed under the contract with the Commission. *See id.*, Ex. 3 at 5. All rights to intellectual property arising out of the agreement, however, were to be disposed of completely at the discretion of the Commission. *See id.* at 21. Likewise, "[a]ll drawings, designs, specifications, data, and other memoranda of record value" prepared in connection with Brookhaven operations were the sole property of the United States. *Id.* at 22. All revenues generated by Brookhaven operations were credited against the cost of work, with the excess remitted to the Commission. *See id.* at 8. The Commission determined which research results would be published for public dissemination and which would remain classified. *See id.* at 4, 19–20.

Associated Universities was obligated to operate Brookhaven exclusively for the benefit of the Commission: "The Contractor [Associated Universities] shall perform such work and services as are in accordance with the general plans, programs and budgets, from time to time agreed upon by the Commission and the Contractor." *Id.* at 3; *see also* Dkt. # 85, Ex. 6 at 1 (then-Brookhaven Director Philip Morse noting that "this Laboratory was created by the Atomic Energy Commission to provide unique facilities for nuclear research …"). Associated Universities needed the permission of the government to use any of the Brookhaven facilities for non-Commission work. *See* Dkt. # 81, Ex. 36. Funding for research was requested on a case by case basis from the Commission. *See id.* at Ex. 12.

The Commission exercised controls over the operation of Brookhaven by requiring a review of all expenditures before Associated Universities would receive funds, *see id.* at Ex. 3 at 9, the right to inspect all documents generated by Associated Universities in performance of the work, *see id.* at 12, the right to inspect the operations in whatever manner and at such times as the Commission deems appropriate, *see id.* at 20, the right to require reports from Associated Universities, see id., and the right to terminate the contract for any reason, *see id.* at 25. Moreover, the Commission exercised substantial control over such Brookhaven labor matters as job descriptions, rates of pay, hours, hiring and termination. *See id.* at 18; *id.*, App. A at 6–7.

Such oversight was considered a matter of legal necessity. As the Ninth Semi–Annual Report of the Commission stated in 1951, "the proper discharge of the [Commission's] responsibilities under the law requires that the [Commission] shall have full access to information concerning the contractor's performance of the contract work and the power to exercise such control and supervision under the contract as the [Commission] may find necessary." Dkt. # 85, Ex. 9 at 62. The Task Force on Basic AEC–Contractor Relationships issued a report in 1953 ("the Task Force Report") that summarized the Commission's responsibilities:

[T]he Commission as the agency which formulates the atomic energy program and obtains funds from the Congress cannot by delegation to its contractors divest itself of responsibility for the proper expenditure of these funds. The Commission is accountable to the Congress and to the President for the progress of the program and the expenditure of public funds, and has the duty of informing itself concerning the activities of its contractors in order that it may report to the President and the Congress, satisfy itself as to the progress and economy of the work, and make decisions and plans for the future of the program.

\* \* \* \* \* \*

The contractor recognizes that the proper discharge of the [Commission's] responsibilities under the law requires that the [Commission] shall have full access to information concerning the contractor's performance of the contract work and the power to exercise such control and supervision under the contract as the [Commission] may find necessary.

*Id.* at Ex. 7 at 4–5. The Task Force Report went on to summarize the basic mechanisms by which the Commission could exercise control over Brookhaven activities:

The primary instruments for determining and controlling the contractor's work are the program assumptions which are the basis for planning, the budget submissions, the approved financial plans, and directives authorizing specific projects. Continuing control to assure that the contractor adheres to established programs is exercised through such devices as monthly cost reports, regular progress reports, conferences with the contractor, review and observation of the work by [Commission] engineers and other specialists, inspection of finished products, and audits.

*Id.* at 10. This conception of the Commission and its contractors as intertwined was reinforced by a speech delivered by Charles Vanden Bulck of the Commission on March 3, 1958 to the Atomic Industrial Forum, in which he described the relationship as making the "contractor and the [Commission] partners in the general sense of the word." *Id.* at Ex. 8 at 19. As part of this "partnership," the Commission agreed to indemnify Associated Universities for all liability awards issued against it, including personal injury awards, barring bad faith or willful misconduct on the part of Associated Universities. *See* Dkt. # 81, Ex. 3 at 15.

**D. *The Conduct of Boron Neutron Capture Therapy Experiments.***

Dr. Farr was hired to serve as a "Senior Physician" and Chairman of the Medical Department at Brookhaven in 1949. *See id.* at Ex. 10. Although technically Dr. Farr must have been an employee of Associated Universities, his employment records show his employer as "Brookhaven National Laboratory." *See id.* In a letter dated November 11, 1948, Dr. Farr made clear, as mention of his employment at Brookhaven, (1) that medical studies must be allowed to be carried out on "patients with disease" and that "[s]uch studies, practically, can be carried out only upon patients relieved from paying a significant part of the costs ..." and (2) that "the physician be enabled to bring to bear on the problem *all* the technics [sic] which may be available and not be limited to any one, particularly one of whose value we as yet have no valid information." Dkt. # 85, Ex. 1. Dr. Farr concluded by stating that his final decision regarding the medical program at Brookhaven could not be given until the Commission approved these two conditions. *See id.*

These statements by Dr. Farr contrast sharply with a consent form used by Associated Universities in the boron neutron capture therapy experiments, which provided, in part:

To the patients admitted free of charge for study of imoved methods of treat-

ment, the hospital gives at all times the most complete care possible. No treatments are employed except those which are designed for benefit of the patient and of other patients who suffer from similar conditions. No treatment is used in which the probable benefit is not believed to outweigh the possibility of untoward effects.

Dkt. # 81, Exs. 21, 23. The initial description of the boron neutron capture therapy program advised the Commission that the experiments would be conducted on patients who only had a few months to live. *See* Dkt. # 85, Ex. 2. Funding proposals by Associated Universities to the Commission in 1958 and 1960, several years after the trials had begun, indicate that Associated Universities sought basic research into the question of whether "untoward effects" existed. *See* Dkt. # 81, Ex. 18 (seeking funding for research whether "the harmlessness of the procedure in relation to all other central nervous system structures" could be shown); *id.* at Ex. 20 (seeking funding to determine whether it can be shown "(1) that the procedure indeed accomplishes its purpose; and (2) that the procedure causes no serious additional damage.").

The parties dispute the level of detail that the Commission used in reviewing the experiment proposals. The Revised Guide for Submission of Research Proposals issued by the Commission indicates that proposed research must be supported by "literature relevant to the proposal, the significance, and motivation [for the proposal] ... [the] objectives, its relation to present knowledge and to comparable work in progress elsewhere...." *Id.* at Ex. 12.

E. *The Relationship of the Defendants.*

The initial description of the boron neutron capture therapy program submitted to the Commission disclosed that inspiration for the proposal had come from "Dr. William Sweet and his group who are our collaborators...." Dkt. # 85, Ex. 2. As late as 1958, Dr. Sweet was still listed in Brookhaven materials as one of Associated Universities' "Research Collaborators." Dkt. # 81, Ex. 7 at XIII.

MIT was one of only nine founding institutions of Associated Universities and held two positions on the Board of Trustees. *See id.* at Ex. 1. All activities of Brookhaven, including its medical research program, must be reviewed and approved by the Board of Trustees. *See id.* at Ex. 5 at iv & Fig. 1. Associated Universities has described itself as the "agent" of all regional educational institutions, including MIT. *See* Dkt. # 85, Ex. 6 at ENZ026 01871–72 ("This is a non-profit educational organization, chartered under the education laws of New York State, and acting as the agent of all educational and research institutions in this region.").

Dr. Gordon Brownell, who was on the faculty of MIT, was actively involved with the entire experiment including the early development of boron neutron capture therapy, the administration of injections to brain cancer patients, and the design, development, and operation of one of the reactors used in the experiment trials. *See* Dkt. # 53, Exs. 2, 3, 10. MIT was the owner and operator of the reactor for twenty-one of the trials and actively participated in the design of that reactor so that it could be used for such trials. *See id.* at Exs. 4, 15, 17.

In its February 9, 1953 report to the Commission, Associated Universities acknowledged a relationship with Mass General: "Explorations are being carried out looking toward adding one or two university hospitals in addition to the Massachusetts General Hospital to the cooperating group." Dkt. # 85, Ex. 11. The same report notes that "[c]ollaboration by the Brookhaven medical staff on segments of problems with investigators in other institutions utilizing the special facilities at Brookhaven are desirable" and lists "Dr. W.H. Sweet et al" and work in the form of "preradiation studies on patients, and their postradiation evaluation, as well as exten-

sions of toxicological observations on boron administration" as part of the collaboration efforts. *Id.* The Brookhaven Annual Report dated July 1, 1954 reinforces this emphasis on group effort: "It is only through cooperation with other medical institutions that a problem as enormous as this can be completely attacked through the use of the special techniques and capabilities of those institutions in conjunction with Brookhaven's special facilities." Dkt. # 81, Ex. 4 at XV.

## III. *Standards*

### A. *Motion to Dismiss.*

 Taking all facts and inferences drawn therefrom in the Plaintiffs' favor, this Court should only grant a motion to dismiss "if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Figueroa v. Rivera,* 147 F.3d 77, 80 (1st Cir.1998). Despite this low threshold, the pleading requirement is "not entirely a toothless tiger." *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 190 (1st Cir.1996). In order to survive a motion to dismiss, the Plaintiffs must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery...." *Cooperman v. Individual, Inc.,* 171 F.3d 43 (1st Cir.1999). As such, the Court need not accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like...." *Rogan v. Menino,* 175 F.3d 75, 77 (1st Cir.1999).

### B. *Motion to Dismiss for Lack of Subject Matter Jurisdiction.*

 In passing on a motion to dismiss for lack of subject matter jurisdiction, a district court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs." *Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir.1998). A district court, however, has "very broad discretion in determining the manner in which in which it will consider the issue of jurisdiction." *Valedon Martinez v. Hospi-*

*tal Presbiteriano de la Comunidad, Inc.,* 806 F.2d 1128, 1132 (1st Cir.1986). Consequently, in deciding a motion to dismiss, a district court may (1) consider evidence submitted by the parties, such as depositions and exhibits; (2) entertain arguments not raised by the parties' memoranda; and (3) resolve factual disputes, if necessary. *See Jones–Booker v. United States,* 16 F.Supp.2d 52, 58 (D.Mass.1998) (Alexander, C.M.J.).

### C. *Motion for Judgment on the Pleadings.*

 Federal Rule of Civil Procedure 12(c) allows a party, "[a]fter the pleadings are closed but within such time as not to delay the trial, [to] move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In reviewing such a motion, the district court must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in her favor." *Feliciano v. Rhode Island,* 160 F.3d 780, 788 (1st Cir.1998) (citations omitted). "Judgment on the pleadings under Rule 12(c) may not be entered unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief." *Id.*

### D. *Motion for Summary Judgment.*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

## IV. *The Price–Anderson Act.*

### A. *Applicability of the Price–Anderson Act.*

MIT seeks partial summary judgment in its favor regarding the applicability of the

Price–Anderson Act (the "Act") to the Plaintiffs' claims. In *Heinrich II*, this Court determined that New York law applied to the Plaintiffs' state law claims, including New York statutes of limitations. *See Heinrich*, 49 F.Supp.2d at 36–37. Because the Act establishes a choice of law rule that requires application of the law of the state in which a nuclear incident occurs, the Court's choice of law analysis may have been insufficiently refined. Specifically, if MIT's contention that the Act applies to the Plaintiffs' state law claims is correct, then two separate statute of limitations analyses will be required: one, under New York law, to govern the conduct that occurred in New York and one, under Massachusetts law, to govern the conduct that occurred in Massachusetts.

The Price–Anderson Act was adopted in 1957 to foster the commercial development of nuclear energy by establishing a public-private insurance pool to cover potential damages resulting from peace-time nuclear accidents. *See Duke Power Co. v. Carolina Env. Study Group, Inc.*, 438 U.S. 59, 63–65, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). "The Act required private nuclear power operators to obtain the amount of liability insurance available from private sources ... and provided a supplementary federal indemnity guarantee of $500 million." *Smith v. General Elec. Co.*, 938 F.Supp. 70, 73 (D.Mass.1996) (Stearns, J.). The Act limited liability for each individual nuclear incident at $560 million, *see* 42 U.S.C. § 2210(e)(1)(C)(ii), and mandated that "any legal liability ... [of any] person who may be liable for public liability" beyond the required private insurance amount be channeled to the federal insurance pool, *id.* at §§ 2014(t), (w), 2210(c), (d).

In *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 258, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Supreme Court determined that a punitive damages award under Oklahoma state law for injuries resulting from nuclear radiation contamination was not preempted by the Act. Congress responded by amending the Act in 1988 to declare a "public liability action" to be a federal cause of action falling under the original and removal jurisdiction of the federal district court, 42 U.S.C. § 2210(n)(2), and to disallow punitive damages "against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification ...," *id.* at § 2210(s). Specifically, the amended Act provides a federal statutory scheme for all "public liability actions" that allege bodily injury resulting from radioactive or other hazardous properties of federally regulated nuclear materials. *Id.* at § 2014(hh). Such actions include "any legal liability arising out of or resulting from a nuclear incident ...," *id.* at § 2014(w), where "nuclear incident" is defined broadly to encompass "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death ...," *id.* at § 2014(q).

Following these amendments, three Courts of Appeals have held that the Act preempts state law claims that arise out of a "nuclear incident," as defined in the Act. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir.1997) (holding that a plaintiff "can sue under the Price–Anderson Act, as amended, or not at all"); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1099–1100 (7th Cir.1994) (noting that "a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action."); *In re TMI Litigation II*, 940 F.2d 832, 854 (3d Cir.1991) (noting that "Congress clearly intended to supplant all possible state causes of action when the factual prerequisite of the statute are met.").

Although the 1988 amendments to the Act clearly created a "federal cause of action," *Day v. NLO, Inc.*, 3 F.3d 153, 154 n. 3 (6th Cir.1993), it is a federal cause of action of a peculiar nature. The Act incorporates state law as the substantive rule of

decision to govern the federal cause of action, so long as the state law is not inconsistent with the purposes of the Act. *See* 42 U.S.C. § 2014(hh). MIT argues that this section requires the Court to analyze the Plaintiffs' state law claims according to the law of the state in which the respective incidents occurred. Thus, New York law would apply to the claims of those plaintiffs whose decedents were treated in New York, while Massachusetts law would apply to those plaintiffs whose decedents were treated in Massachusetts. Because state choice of law principles are also incorporated into the federal cause of action, *see In re Hanford Nuclear Reservation Litig.*, 780 F.Supp. 1551, 1571 (E.D.Wash.1991) (noting that section 2014(hh) "mean[s] the whole law of the state, including any choice of law provisions"), *Heinrich II* remains almost entirely intact even if the Court determines the Act to apply. The only issue for reconsideration is the question of which state's law governs the statute of limitations defense. In *Heinrich II*, this issue was treated as a question of federal law hinging on the procedural intricacies of transfer. If the Act applies, however, the question would need to be treated as matter of state law determined by reference to the law of the state in which the different treatments occurred.

The Plaintiffs contest the rather clear language of the statute by arguing that "nuclear incident" should only be interpreted to mean an unintended escape or release of nuclear energy. Judge Beckwith adopted this interpretation in *In re Cincinnati Radiation Litigation*, 874 F.Supp. 796, 830–32 (S.D.Ohio 1995), reasoning that the "public liability" amendments to the Act were intended to address only "unintended" escapes of nuclear radiation. Several reported cases, however, appear to undermine this interpretation of the statute. *See Day v. NLO, Inc.*, 851 F.Supp. 869 (S.D.Ohio 1994) (Act applies to claims of occupational exposure to radiation not alleged to have been caused by accidental release); *Sawyer v. Commonwealth Edison Co.*, 847 F.Supp. 96 (N.D.Ill.1994) (Act applies to claim for injuries resulting from alleged ongoing occupational exposure); *Coley v. Commonwealth Edison Co.*, 768 F.Supp. 625 (N.D.Ill.1991) (same); *Building and Constr. Trades Dep't v. Rockwell Int'l*, 756 F.Supp. 492 (D.Colo.1991) (Act applies to intentional and negligent tort claims related to occupational exposure).

As noted in *Gilberg v. Stepan Co.*, 24 F.Supp.2d 325, 340 (D.N.J.1998), the Act "neither requires that a nuclear source be used as intended nor requires that the escape or release of nuclear material be unintended." Instead, "[w]hat Price–Anderson does require is that the escape or release occur in connection with indemnified activity . . . ." *Id.* Magistrate Judge Hedges' exhaustive analysis of the statute and applicable case law shows that the necessary predicate to operation of the jurisdictional scheme is the existence of an indemnification agreement between the government and the defendant with respect to the complained of activity: "In the absence of an indemnification agreement, entered into under 42 U.S.C. § 2210 and covering the activities which gave rise to the liability alleged, there can be no 'occurrence,' that is, no event at the site of 'licensed activity,' that would constitute a 'nuclear incident.' " *Id.*[1] The determina-

---

1. The Plaintiffs also argue that "nuclear medicine" is per se excluded from the Act, regardless of whether an indemnification agreement is in place. They attempt to draw support for this proposition from a Senate Report which stated that "[t]he scope of the coverage provided by this provision is limited to releases of such materials as a result of activities other than patient diagnosis or therapy." S.Rep. No. 100–218, pt. F(198),

reprinted in 1988 U.S.C.C.A.N. 1484. That language, however, referred to the provision requiring certain nuclear licensees to have and maintain financial protection under section 2210(a) of the Act; it did not refer to the provision defining what constitutes a "public liability action" within the meaning of the Act. *See Gilberg*, 24 F.Supp.2d at 340. Although Congress directed the Nuclear Regulatory Commission (the "NRC") to review

tive issue, therefore, is whether the indemnification agreements between the Commission and the various private defendants in this action covered the activities challenged by the Plaintiffs. If they did, the claims of plaintiffs Heinrich and Sienkewitz would be subject to Massachusetts law because their decedents were treated in Massachusetts.[2] *See* 42 U.S.C. § 2014(hh).

Although the issue may eventually be revisited as between the private defendants and the United States, the Court must make a determination now regarding the applicability of the Act in order that the litigation proceed. It must be emphasized that this ruling is based only on a preliminary record and is intended in no way to bind any subsequent tribunal faced with the task of determining whether the United States in fact must indemnify a judgment rendered against the private defendants. Instead, the Court is simply treating the question as one of threshold importance: does an indemnification agreement exist between the United States and the various private defendants that presumptively applies to the challenged conduct in this litigation? If so, the Act will apply in this case, regardless of whether or not the indemnification agreement is later interpreted to reach the conduct of the private defendants.

■ With that proviso in mind, the Court rules that the challenged conduct in the instant litigation (with the exception of the alleged boron injections, *see supra* n. 2) is subject to an indemnification agreement with the United States. There are a variety of reasons for so holding. First, the available evidence suggests that a valid and binding indemnification agreement does exist that may eventually be interpreted to cover the challenged conduct. *See* Dkt. # 119 at ¶ 3 & Ex. B; Dkt. # 81, Ex. 3 at 15.[3] Second, holding that an indemnification obligation is in place and that the Act therefore applies does no harm to the Plaintiffs. Indeed, as will be seen below, it significantly aids them by preserving some of the state law claims that would otherwise be time-barred, including a potential claim for punitive damages. Third, it would be both impractical and inequitable to require the United States to litigate the issue of indemnification at this stage in the proceedings, yet some ruling on the issue of the applicability of the Act is required before the litigation can continue.

this exemption of nuclear medicine from financial protection requirements, the NRC concluded that the exemption was justified because facilities practicing nuclear medicine typically use radioactive materials outside NRC jurisdiction. *See* Indemnification of Licensees That Manufacture, Produce, Process, or Use Radiopharmaceuticals or Radioisotopes for Medical Purposes, 54 Fed.Reg. 22,-444-45 (1989). None of this legislative history supports the conclusion that nuclear medicine is excluded per se from the Act's "public liability action" provisions. Instead, it supports the conclusion that the existence of a government indemnification agreement is the determinative issue for the applicability of the Act.

2. As the Plaintiffs point out, however, the Price–Anderson Act is inapplicable to the claims for toxic boron injections (as opposed to boron neutron capture therapy) because boron is not "source, special nuclear, or by-product material" within the meaning of the Act. 42 U.S.C. § 2014(q). Thus, if the Act

applies at all, Massachusetts plaintiffs whose decedents were allegedly subjected to boron injections would have causes of action built on two separate types of conduct, necessitating two separate analyses of the statute of limitations defense.

3. The NRC has taken the position that MIT's indemnification agreement does not cover the conduct challenged by the Plaintiffs in this action. *See* Dkt. # 122, Ex. 1. Likewise, the Plaintiffs argue that Brookhaven's indemnity will not cover any damages awarded in this case because it excludes "bad faith" and "willful misconduct." *See id.* at 4 n. 2. Whether these positions turn out to be correct is irrelevant to the present question which is, simply, whether an indemnification agreement exists that presumptively applies to the challenged conduct. This Court will not require the United States to litigate a final determination of the scope of its indemnification duties prior to the establishment, if any, of primary liability on the part of the private defendants.

All of these factors have been made clear to the parties. Both MIT and Mass General[4] desire Price–Anderson applicability, despite knowledge that the Act will likely preserve state law claims that would otherwise be time-barred. The reason for this seemingly self-defeating litigation posture is that arguing against applicability of the Act now might prejudice MIT and Mass General in later attempts to argue that the United States must indemnify them. This the parties are understandably unwilling to do. Thus, MIT and Mass General have maintained that the United States is obligated to indemnify them for any liability which occurs out of the instant litigation with respect to the conduct of boron neutron capture therapy treatments. Because this theory of the case does not prejudice and indeed actually benefits the Plaintiffs, the Court holds that, for purposes of the present motions, an indemnity agreement between the United States and the private defendants is in place sufficient to trigger application of the Act.

Thus, MIT's motion for partial summary judgment on the applicability of the Price–Anderson Act is GRANTED. The Court rules that the Act governs the Plaintiffs' state law claims insofar as they are premised on boron neutron capture therapy treatments, as opposed to boron injections.[5] The Order issued in *Heinrich II* is thus hereby AMENDED to clarify the role of the Price–Anderson Act as a federal law overlay to these state law claims. Because the Act incorporates state law rules of decision, including choice of law rules, the *Heinrich II* Order remains in full force and effect[6] with the exception of the Court's determination that New York statutes of limitations apply to all state law claims. Instead, the Massachusetts Plaintiffs' state law claims based on radiation treatment conduct that occurred in Massachusetts should be analyzed separately under the statutes of limitations of the state in which the challenged conduct occurred, i.e., Massachusetts.[7]

4. Associated Universities has never contended that the Act applies. Nevertheless, it recognizes that a determination that the Act applies to the claims against Mass General and MIT necessarily implies that the Act applies as well to claims against Associated Universities. *See* Dkt. # 116 at 1.

5. There is some question whether the indemnity agreement between Associated Universities and the Atomic Energy Commission should be considered sufficient to trigger application of the Act because it was entered into eleven years prior to the passing of the Act, *see* Dkt. # 81, Ex. 1, and thus cannot be considered "entered into under 42 U.S.C. § 2210." While recognizing this issue, the Court does not rule on it in light of the fact that New York law would apply to the claims against Associated Universities regardless of the outcome.

6. Apart from the ruling on statutes of limitations, the state law rulings contained in the April 30 Order depended on the conclusion that Massachusetts and New York law would require the same result as to each issue. Thus, the applicability of the Act does not affect *Heinrich II* as to rulings that would come out the same regardless of which state's law governed. This includes the Court's ruling on the availability of punitive damages under state law which reasoned that New

York courts, applying New York choice of law principles, would follow Massachusetts in allowing punitive damages.

7. MIT has also indicated that it plans to contest the Court's ruling that punitive damages are available under the Massachusetts Wrongful Death statute. Although the issue is not before the Court, there is reason to be skeptical of this argument. The 1988 Amendments to the Act specifically prohibited "punitive damages in any action with respect to a nuclear incident ...." 42 U.S.C. § 2210(s). That provision, however, only applies with respect to "nuclear incidents occurring on or after [August 20, 1988 (the effective date of the Amendments) ]." *Id.* at § 2014 note. Because all of the alleged conduct in the present case occurred prior to August 20, 1988, the Court's ruling on punitive damages appears to have been proper, regardless of the applicability of the Act. *See In re TMI*, 67 F.3d 1119, 1124 (3d Cir.1995) (noting that the limitation on punitive damages "applies only 'with respect to nuclear incidents occurring on or after Aug. 20, 1998.' "); *Cook v. Rockwell Int'l Corp.*, 755 F.Supp. 1468, 1480–81 (D.Colo.1991) (holding that private contractors at fault in pre–1988 nuclear incidents may be held fully liable for punitive damages); *Crawford v. National Lead Co.*, 784 F.Supp. 439, 447 (S.D.Ohio 1989) (holding that a con-

B. *Associated Universities' Request for Transfer*

■ Associated Universities contends that if the Court determines that the Act applies, the case should be bifurcated and retransfered in part to the Eastern District of New York. Specifically, Associated Universities argues that the Act requires transfer to the federal district court for the district in which a "nuclear incident" occurred. *See* 42 U.S.C. § 2210(n)(2) ("With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place ... shall have original jurisdiction [and] upon motion of the defendant ... any such action ... *shall* be removed or transferred to the United States district court having venue under this subsection.") (emphasis added).

The cited statutory provision does not contemplate a case such as the one at bar, in which a common factual nucleus involving interrelated defendants encompasses conduct in more than one district. This Court will not interpret the Act to require that this case be separated into two different actions because such an increased expenditure of judicial and litigant resources would be precisely contrary to the intent of the statute. The Third Circuit has well analyzed this legislative intent:

> Prior to the Amendments Act [of 1988], the grant of federal jurisdiction and right of removal were available only in actions resulting from an extraordinary nuclear occurrence. The decision to expand the jurisdictional grant was based upon the fact that "[t]he experience with

claims following the TMI [Three Mile Island] accident demonstrate[d] the advantages of the ability to consolidate claims after the nuclear incident. Attorneys representing both plaintiffs and defendants in the TMI litigation testified ... that the ability to consolidate claims in federal court would greatly benefit the process for determining compensation for claimants.... The availability of the provisions for consolidation of claims in the event of any nuclear incident ... would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation." S.Rep. No. 218, 100th Cong., 2d Sess. 13, reprinted in 1988 U.S.Code Cong. & Admin. News 1476, 1488.

*In re TMI II*, 940 F.2d at 853 n. 18. Associated Universities' requested transfer, though arguably required by the language of the statute, would be directly contrary to the very purpose of the 1988 legislative amendments. Thus, this Court will retain jurisdiction over the entire action, despite the applicability of the Act.[8]

V. *Statute of Limitations Analysis for State Law Claims.*

Following *Heinrich II*, only the following five state law claims remain: Fraud (Count II); Failure to Obtain Informed Consent (Count VII); Wrongful Death (Count VIII); Negligence (Count X); and Negligent Misrepresentation (Count XI). Associated Universities and Mass General seek a ruling that all of these state law claims are time-barred. The following analysis is divided into sections on New York and Massachusetts law. New York

---

tractor is not immune from punitive damages for pre–1988 nuclear incident).

**8.** The Plaintiffs argue, with some force, that the same purpose of avoiding "inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions" counsels against interpreting the Act to require application of both New York and Massachusetts law to essentially similar conduct. This may well be true, but the plain language of the statute compels just that result. When

interpreting the Act's venue provision, a matter chiefly concerned with judicial administration, this Court is justified in interpreting the language of the statute to avoid an incongruous result. When interpreting Congress' selection of substantive rules of decision, however, the unequivocal text must govern. *See Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997); *Baez v. INS*, 41 F.3d 19, 24 (1st Cir.1994).

law governs all Plaintiffs' claims except the claims premised on boron neutron capture therapy treatments conducted in Massachusetts, which are governed by Massachusetts law.

### A. New York Statute of Limitations Analysis for Non–Fraud Claims.

The longest possible limitations period applicable to the Plaintiffs' non-fraud claims is six years. *See Asbeka Indus. v. Travelers Indem. Co.*, 831 F.Supp. 74, 80 (E.D.N.Y.1993) (noting that some New York cases apply a six year limitations period to negligent misrepresentation claims). Because all of the challenged conduct occurred over thirty-five years ago, the Plaintiffs need the benefit of some tolling device in order to overcome the statute of limitations defense.[9] New York courts have expressly declined to adopt a discovery rule for non-fraud state law claims. *See Rizk v. Cohen*, 73 N.Y.2d 98, 538 N.Y.S.2d 229, 232 n. 3, 535 N.E.2d 282 (1989) (noting that New York "has consistently refused to judicially adopt the so-called 'discovery rule' "). Instead, under New York law for non-fraud claims, a plaintiff must rely on the doctrine of fraudulent concealment: a "defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v.*

*Saeli*, 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). However, "[t]he doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances." *Gross v. New York City Health & Hosps. Corp.*, 122 A.D.2d 793, 505 N.Y.S.2d 678, 679 (N.Y.A.D.1986).

The Plaintiffs allege that the defendants fraudulently concealed the "true nature" of the experiments from them and their decedents and, consequently, the Plaintiffs did not discover the facts which form the basis of their claims until 1995. Dkt. # 21 at ¶ 78. Associated Universities and Mass General argue that the Plaintiffs cannot satisfy the requirements of fraudulent concealment because New York requires that the defendant's allegedly deceptive acts be distinct from—and occur subsequent to—the allegedly wrongful acts that form the basis of the claim. *See* Dkt. # 98 at 1–2. Several reported cases back them up. *See Rizk*, 538 N.Y.S.2d at 233, 535 N.E.2d 282 (equitable estoppel inapplicable where "plaintiff's allegations do not establish that [defendant], acting with knowledge of prior malpractice, made isubsequent [sic] misrepresentations in an attempt to conceal his earlier negligence")[10]; *Chesrow v. Galiani*, 234 A.D.2d 9, 650 N.Y.S.2d 158, 160 (N.Y.A.D.1996) ("[T]here can be no fraudulent misrepresentation where, as in the

**9.** The general rule under New York law is that the statute of limitations begins to run on non-fraud causes of action when the claims accrue. *See* N.Y.Civ.Prac.L. & R. 203(a) ("The time within which an action must be commenced, except as otherwise expressly prescribed, shall be computed from the time the cause of action accrued to the time the claim is interposed."). A cause of action generally accrues at the time of the alleged wrongdoing or the resulting injury. *See Coughlin v. International Bus. Machs. Corp.*, 225 A.D.2d 256, 650 N.Y.S.2d 477, 479 (N.Y.A.D.1996). Thus, the Plaintiffs' claims for lack of informed consent accrued on the date of the last treatment received by their decedents. *See* N.Y.Civ.Prac.L. & R. 214–a. The negligence claims accrued on the date of the alleged injury. *See Brooklyn Union Gas Co. v. Hunter Turbo Corp.*, 241 A.D.2d 505, 660 N.Y.S.2d 877, 878 (N.Y.A.D.1997). The

wrongful death claims accrued on the date of the Plaintiffs' decedents' death. *See* N.Y.Est. Powers & Trusts Law § 5–4.1. Finally, the negligent misrepresentation claims "accrue[d] when the misrepresentation [was] made." *In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239, 1255 (S.D.N.Y.1996).

**10.** The Plaintiffs contend that the *Rizk* case is inapplicable because it appears to address fraudulent concealment as a cause of action rather than as an equitable defense to the statute of limitations. *See* Dkt. # 108, at 12. The *Rizk* court, however, was responding to the plaintiff's claim that "defendants should be estopped from asserting the Statute of Limitations defense due to their fraudulent concealment." *See Rizk*, 538 N.Y.S.2d at 231, 535 N.E.2d 282.

matter at bar, the plaintiff relies on the same act which forms the basis of his negligence claim ... as the foundation of an asserted equitable estoppel."); *Vinciguerra v. Jameson,* 208 A.D.2d 1136, 617 N.Y.S.2d 942, 944 (N.Y.App.Div.1994) ("To succeed on her fraudulent concealment claim, plaintiff must establish that defendants had knowledge of their prior malpractice and made subsequent misrepresentations in an attempt to conceal their earlier negligence"); *see also Smith v. Smith,* 830 F.2d 11, 13 (2d Cir.1987) (applying New York law and holding that equitable estoppel can be invoked only "when some conduct by defendant after his initial wrongdoing has prevented the plaintiff from discovering or suing upon the initial wrong.").

▮ Although the Plaintiffs offer several arguments in opposition, the above cases are fatal to them. First, the Plaintiffs attempt to argue that the alleged wrong was the *proposal* of the experiments rather than the *conduct* of them, such that the representations made to Plaintiffs' decedents were "subsequent to" the alleged wrong. Dkt. # 108 at 11 n. 7. This argument misconceives the nature of the causes of action—if the alleged wrong was the mere proposal of the experiments, no cause of action would be stated because no injury would have been alleged. Rather, it is only the actual conduct of the experiments that could possibly give rise to a cause of action. Second, the Plaintiffs argue that the fact that the defendants made alleged misrepresentations prior to the conduct of the experiments simply reflects that this is an unusual case necessitating a departure from established principles. *See id.* at 11. Given the clear

language from controlling New York case law, however, the Court declines the Plaintiffs' invitation to fashion new state law rules of decision.

Essentially, the Plaintiffs argue that the "defendants' conduct in fraudulently assuring the plaintiffs that no procedure would be used on them unless it had therapeutic benefit and unless that benefit exceeded the untoward effects, lulled them into a false sense of security which dissuaded them from questioning whether a tort was committed and deprived them of the opportunity to refuse the treatment." *Id.* at 12–13. It is this conduct, the Plaintiffs believe, that "equitably estops defendants from asserting the statute of limitations defense...." *Id.* at 13. This conduct, however, is indistinguishable from the conduct that forms the basis of the Plaintiffs' causes of action. Under New York law, equitable estoppel must be premised on some facts other than those which form the basis of the time-barred causes of actions. *See Smith,* 830 F.2d at 13; *Chesrow,* 650 N.Y.S.2d at 160. In such a situation, dismissal of the non-fraud state law claims is appropriate:

> [N]o triable issue is presented with respect to whether the defendants fraudulently concealed facts which induced the plaintiff and his decedent to refrain from timely commencement of the action giving rise to an estoppel.... Neither the plaintiff nor his decedent had contact with the defendants after [the alleged tortious conduct] and before the Statute of Limitations ran ... and there was thus no occasion for the defendants to make any representations to them....

*Phelps v. Greco,* 177 A.D.2d 559, 576 N.Y.S.2d 158, 160 (N.Y.A.D.1991).[11] Thus,

---

11. The Plaintiffs also contend that a New York statute creating a discovery rule for toxic exposures applies to this case. *See* N.Y.Civ. Prac.L. & R. 214–c. This statute, however, only establishes that the limitations period shall be calculated from the date of the discovery of the injury, where injury "will not be dependent upon the discovery of the cause of the injury ...," *Hedlund v. County of Tomp-*

*kins,* 235 A.D.2d 980, 652 N.Y.S.2d 877, 879 (1997), but instead will only "refer to an actual illness, physical condition or other similarly discoverable objective manifestation of the damage caused by previous exposure to an injurious substance," *Sweeney v. General Printing, Inc.,* 210 A.D.2d 865, 621 N.Y.S.2d 132, 133 (N.Y.A.D.1994); *see also Whitney v. Agway, Inc.,* 238 A.D.2d 782, 656 N.Y.S.2d

the Court GRANTS the motions of Mass General and Associated Universities to dismiss the non-fraud state law claims, with the exception of radiation therapy claims brought by Massachusetts Plaintiffs premised on conduct that occurred in Massachusetts, as untimely filed under the respectively applicable statutes of limitations.[12]

### B. New York Statute of Limitations Analysis for Fraud Claims.

■ Unlike the non-fraud causes of actions, a claim of fraud in New York is subject to a discovery rule. A claim must be brought within six years of the alleged fraud or within two years of the time the plaintiff discovered or reasonably should have discovered the fraud. See N.Y.Civ. Prac.L. & R. 213(8), 203(g). Because this Court has already held that the Plaintiffs are not time-barred under a similar discovery rule analysis for certain federal law claims, see Heinrich I, 44 F.Supp.2d at 418 (refusing to dismiss claims as untimely under the Federal Tort Claims Act), the Plaintiffs appear to be on solid ground with respect to the New York fraud claims.

■ As Associated Universities and Mass General argue, however, New York courts require that allegations of fraud be sufficiently distinct from a plaintiff's other causes of action in order to invoke the benefit of the longer statute of limitations period. See Cottonaro v. Southtowns Indus., Inc., 213 A.D.2d 993, 625 N.Y.S.2d 773, 775 (N.Y.A.D.1995) (noting that "[w]here allegations of fraud are only inci-

dental to another cause of action, the fraud Statute of Limitations cannot be invoked"); New York Seven–Up Bottling Co. v. Dow Chem. Co., 96 A.D.2d 1051, 466 N.Y.S.2d 478, 480 (N.Y.A.D.1983) ("The six-year fraud Statute of Limitations ... is only applicable when there would be no injury but for the fraud.... Where the allegations of fraud are only incidental to another cause of action, the fraud Statute of Limitations cannot be invoked."). This has long been the rule in New York. See Brick v. Cohn–Hall–Marx Co., 276 N.Y. 259, 11 N.E.2d 902, 904 (1937); Tulloch v. Haselo, 218 A.D. 313, 218 N.Y.S. 139, 142 (N.Y.A.D.1926); Glover v. National Bank of Commerce of New York, 156 A.D. 247, 141 N.Y.S. 409, 415–17 (N.Y.A.D.1913).

As noted above with respect to the rule that fraudulent concealment must be distinct from an underlying cause of action sought to be rescued from the statute of limitations, the Plaintiffs have not alleged any conduct that would form the basis for a fraud claim separate from the conduct that forms all of their state law claims. The Plaintiffs argue that this analysis amounts to "rearguing for dismissal of the fraud claim, not making a statute of limitations argument." Dkt. # 108 at 14 n. 8. They believe that Heinrich II forecloses such reargument. See id. at 13. The Plaintiffs' argument, however, misconstrues Heinrich II and the law of the state of New York. First, in Heinrich II, this Court rejected the defendants' claim that the fraud count should be dismissed for

455, 457 (N.Y.A.D.1997); Rothstein v. Tennessee Gas Pipeline Co., 204 A.D.2d 39, 616 N.Y.S.2d 902, 905 (N.Y.A.D.1994). Because all Plaintiffs' decedents died more than six years prior to the date of the filing of this action, the New York toxic exposure statute cannot benefit the Plaintiffs.

**12.** As an alternative ground for so holding, the New York courts have emphasized that "mere silence or failure to disclose the wrongdoing is insufficient" to invoke equitable estoppel. Zoe G. v. Frederick F.G., 208 A.D.2d 675, 617 N.Y.S.2d 370, 371 (N.Y.A.D. 1994). In the instant case, the Plaintiffs have

offered no specific allegations of affirmative acts of concealment by any of the defendants following the conduct of the experiments. Rather they have merely alleged a generalized "deliberate effort to fraudulently conceal" the "true nature" of the experiments from the Plaintiffs. Dkt. # 21 at ¶ 78. Such allegations are insufficient as matter of law. See Renda v. Frazer, 75 A.D.2d 490, 429 N.Y.S.2d 944, 946 (N.Y.A.D.1980) (noting that "application of the doctrine of equitable estoppel will be rejected if plaintiff neither pleads, alleges, nor presents evidentiary facts supporting a claim of fraud or fraudulent concealment").

failure to comply with Rule 9(b); the separate argument that the fraud claim is untimely filed under state law was not addressed. Second, New York case law on the applicability of the fraud statute of limitations expressly corresponds with that state's law on the viability of a fraud count separate from related causes of action. The Plaintiffs essentially concede this point when they argue that "[i]n the cases relied upon by defendants, the statute of limitations on all claims, except the fraud claim, had run and thus the case turned on whether there was an independent fraud claim at all...." *Id.* Because the other New York claims have been dismissed, this precise issue is before the Court.

Therefore, under applicable New York law, the count for fraud must be dismissed: "It is ... a well-established principle of law that where an allegation of fraud is not essential to the cause of action pleaded except as an answer to an anticipated defense of statute of limitations, courts 'look for the reality, and the essence of the action and not its mere name.'" *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 490 N.Y.S.2d 190, 192 (N.Y.A.D.1985). In other words, "[w]here the alleged fraud is merely 'the means of accomplishing the [actionable act] and add[s] nothing to the causes of action ...,' the statute of limitations applicable to fraud claims will not control." *Id.* at 193. For this reason, the Court GRANTS the motions of Mass General and Associated Universities to dismiss the fraud count except insofar as the count is premised on radiation treatments conducted in Massachusetts.

C. *Massachusetts Statute of Limitations Analysis.*

 The state law claims premised on the conduct of radiation treatments in Massachusetts are subject to Massachusetts statutes of limitations. Unlike New York, Massachusetts imposes a fiduciary duty on doctors to disclose known possible causes of action to patients. *See Bourassa v. LaFortune*, 711 F.Supp. 43, 47 (D.Mass.

1989) (Harrington, J.). Consequently, in order to gain the benefit of fraudulent concealment tolling rules, the Massachusetts Plaintiffs challenging conduct in Massachusetts need not allege a separate, subsequent act of fraud as in New York:

> When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under § G.L. c. 260, 12, for the period prior to the plaintiff's discovery of the cause of action. Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12.

*Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 519, 677 N.E.2d 159 (1997). The Massachusetts Plaintiffs need only show that the private defendants failed to disclose the facts which give rise to a possible cause of action, and that the Massachusetts Plaintiffs did not otherwise gain knowledge of those facts at an earlier time:

> An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under § G.L. c. 260, 12. Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary. The plaintiff is not required to have made an independent investigation.

*Id.* at 519–20, 677 N.E.2d 159 (citations omitted). Thus, because the Massachusetts Plaintiffs allege that they did not gain actual knowledge of the "true nature" of the boron neutron capture therapy experiments until 1995, *see* Dkt. # 21 at ¶¶ 4, 78, 95, their claims are not time-barred under Massachusetts law.

 An independent ground for so holding is that both the Massachusetts Wrongful Death and Survival statutes expressly contain a discovery rule. *See* Mass.Gen.L. ch. 229, § 2 (Wrongful

Death); Mass.Gen.L. ch. 260, § 10 (Survival). The Court's reasoning in the April 20 Order, *see Heinrich*, 44 F.Supp.2d at 418 (denying the United States' motion to dismiss the Plaintiffs' claims as time-barred under the Federal Tort Claims Act), applies with equal force under Massachusetts discovery rule principles. Mass General attempts to counter this line of reasoning by arguing that the Massachusetts statutes did not contain a tolling provision during the time when the experiments were conducted. *See Pobieglo v. Monsanto Co.*, 402 Mass. 112, 116, 521 N.E.2d 728 (1988) (holding that "[a]pplication of a rule which would delay accrual until discovery would be in clear contravention of the legislative directive that the period of limitations runs from the date of death."). Rather, it was only following *Pobieglo* that the Massachusetts legislature amended the Wrongful Death and Survival statutes to provide for a discovery rule. *See Fowles v. Lingos*, 30 Mass.App.Ct. 435, 437 n. 4, 569 N.E.2d 416 (1991).

Mass General argues that the discovery rule amendments should not be applied retroactively. The cases cited in support of this argument, however, are inapposite. The issue was not raised in *Fowles* and, thus, any supportive language that the private defendants divine from that case is mere dictum. *See id.* ("The plaintiff does not argue that the amendment applies to this case."). In *Baldassari v. Public Finance Trust*, 369 Mass. 33, 337 N.E.2d 701 (1975), the court was addressing two statutory amendments that had express effective dates, unlike the discovery rule amendments.

■ In the absence of an express effective date provision, Massachusetts courts give statutes of limitations amendments full retroactive effect: "The general rule is that if a statute of limitations does not contain language clearly limiting its application to causes of action arising in the future, then it controls future procedure in reference to previously existing causes of action." *Anderson v. Phoenix Inv. Counsel of Boston, Inc.*, 387 Mass. 444, 453–54, 440 N.E.2d 1164 (1982); *accord Carter v. Supermarkets Gen. Corp.*, 684 F.2d 187, 191 n. 9 (1st Cir.1982) ("Massachusetts follows the general rule that, absent clear legislative intent, statutes affecting substantive rights are prospective, whereas statutes affecting procedure or remedies may be retroactive."). This general rule of retroactivity applies to tolling rules, as well as statutory time periods. *See Cioffi v. Guenther*, 374 Mass. 1, 2–3, 370 N.E.2d 1003 (1977) (upholding retroactive application of statute which eliminated tolling provision for underage plaintiffs in medical malpractice cases).

■ Massachusetts courts attach only one proviso to retroactive application of statutes of limitations: "If a statute of limitations restricts the time for enforcing such accrued rights, it is constitutional [only] if there is a reasonable time after the enactment of the statute for enforcing these rights." *Anderson*, 387 Mass. at 454–55, 440 N.E.2d 1164 (amendment shortening plaintiffs' filing window to six days held unreasonable as applied to them). In the instant case, the amendments to the Wrongful Death and Survival statutes *expanded* the window for filing a cause of action by incorporating a discovery rule; thus, no question is even raised of the propriety of retroactive application.

In short, both because the Massachusetts Plaintiffs have satisfied the requirements to allege fraudulent concealment by virtue of a breach of fiduciary relationship under Mass.Gen.L. ch. 260, § 12, and because they are entitled to a discovery rule under the Massachusetts Wrongful Death and Survival Statutes, the Court DENIES the motions to dismiss the Massachusetts Plaintiffs' remaining state law claims insofar as they are premised on the conduct of boron neutron capture therapy in Massachusetts.[13]

---

13. Significantly, either ground is sufficient to toll the statute of limitations period. *See*

## VI. *Bivens.*

The private defendants bring five main arguments in support of their various motions for dismissal or summary judgment on the viability of the Plaintiffs' *Bivens* claim. First, they contend that *Bivens* is not available against private defendants. Second, they argue that *Bivens* is not available against non-individual entities, even if suit can be brought against private defendants. Third, the private defendants believe that the Plaintiffs cannot show, as a matter of law, that the private defendants acted under color of law, a prerequisite to *Bivens* liability. Finally, the private defendants contend that, even if they did act under color of law, the claim should be dismissed both because the Plaintiffs have failed to allege a violation of a constitutional right and because, even if they have, any such right was not clearly established at the time of the challenged conduct.

This Court treats each issue as arising on a motion to dismiss, except with respect to the issue of whether the private defendants can be considered government actors. Because the Court has received extensive documents from Associated Universities and the Plaintiffs with respect to that issue, it is treated as a motion for summary judgment.

### A. *Availability of Bivens Against Private Actors.*

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized an implied cause of action for damages against federal agents who allegedly violate a plaintiff's constitutional rights. The Supreme Court has not considered whether *Bivens* extends to suits against private parties acting under color of federal law. The First Circuit has stated, in dicta, that "[w]hile federal officers may, at times, be subject to suit for unconstitutional behavior, . . . , there is no cause of action against private parties acting under color of federal law or custom." *Fletcher v. Rhode Island Hosp. Trust Nat'l Bank*, 496 F.2d 927, 932 n. 8 (1st Cir.1974) (citation omitted); *accord Kelley v. Action for Boston Community Dev., Inc.*, 419 F.Supp. 511, 525 (D.Mass.1976) (Tauro, J.). Other courts have read Fletcher as precluding a plaintiff from ever bringing a *Bivens* claim against a private party, even if that party has acted under color of federal law. *See DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 844 F.2d 714, 720 n. 5 (10th Cir.1988); *Alexander v. Pennsylvania Dep't of Banking*, No. 93–5510, 1994 WL 144305, at *3 (E.D.Pa. Apr.21, 1994); *Lovelace v. Whitney*, 684 F.Supp. 1438, 1442 n. 4 (N.D.Ill.1988); *Stevens v. Morrison–Knudsen Saudi Arabia Consortium*, 576 F.Supp. 516, 520–21 (D.Md.1983). In a later case, however, the First Circuit seemed to assume, without deciding, that a *Bivens* action could lie against a private party if it had acted under color of federal law. *See Gerena v. Puerto Rico Legal Servs., Inc.*, 697 F.2d 447, 452 (1st Cir. 1983).

While other Courts of Appeals have considered this question, none has adopted the *Fletcher* position. Four Courts of Appeals have held that a private party acting in concert with a federal actor may be held liable under *Bivens* for constitutional harms. *See Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1337–38 (9th Cir.1987); *Reuber v. United States* 750 F.2d 1039, 1057 (D.C.Cir.1984); *Dobyns v. E–Systems, Inc.*, 667 F.2d 1219, 1222–23 (5th Cir.1982); *Yiamouyiannis v. Chemical Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir.1975). Three others have declined to answer whether a plaintiff may assert a *Bivens* claim against a private actor. *See DeVargas*, 844 F.2d at 720 n. 5; *Morast v. Lance*, 807 F.2d 926, 930–31 (11th Cir. 1987); *McNally v. Pulitzer Publ'g Co.*, 532 F.2d 69, 75–76 (8th Cir.1976); *see also*

*Fowles*, 30 Mass.App.Ct. at 438–442, 569 N.E.2d 416 (addressing fraudulent conceal-

ment tolling argument even though court had held that discovery rule did not apply).

*Lovelace,* 684 F.Supp. at 1442 n. 4; *Stevens,* 576 F.Supp. at 520–21.

■■■ Given the ambiguous nature of the First Circuit's *Fletcher* opinion and the contrary consensus of the majority of the other Circuit Courts of Appeal, this Court holds that *Bivens* does extend to actions against private parties who act under color of federal law.

### B. *Availability of Bivens Against Non–Individual Entities.*

■■■ A special issue remains with respect to the *Bivens* action against MIT, Mass General, and Associated Universities; namely, whether the Supreme Court's decision in *Federal Deposit Insurance Corporation v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), precludes a *Bivens* action against non-individual private entities, regardless of whether *Bivens* applies to private actors. In *Meyer,* the Supreme Court refused to extend *Bivens* to suits against federal agencies. The Court reasoned that extension of *Bivens* to entities would eviscerate one of the goals of *Bivens,* which is to deter individual officers from inflicting constitutional harms. *See id.* at 485, 114 S.Ct. 996. Because agencies are not entitled to qualified immunity while individual officials are, plaintiffs in a *Bivens* suit would invariably sue the federal agency rather than the official, thereby undermining the deterrent effect of the suit. As an alternate ground for its decision, the *Meyer* Court noted that the potential for direct suits against federal agencies raised serious concerns of federal fiscal policy that were best left for Congress to decide. *See id.* at 486, 114 S.Ct. 996.

The D.C. Circuit has interpreted *Meyer* to preclude a *Bivens* action against a private entity with links to the federal government. *See Kauffman v. Anglo–American Sch. Of Sofia,* 28 F.3d 1223, 1224 (D.C.Cir.1994). In *Kauffman,* the plaintiff sued a private school after its governing board fired him from his position as the school's director. *See id.* The school re-

ceived funding from the State Department, which had created the school to provide elementary education to the children of diplomats stationed in Sofia, Bulgaria. *See id.* The court held that *Meyer* barred the plaintiff's *Bivens* claim even though the school was not a federal agency because it would frustrate the deterrent goal of *Bivens* and because the Supreme Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Id.* at 1228 (citing *Meyer,* 510 U.S. at 484, 114 S.Ct. 996).

By contrast, in *Hammons v. Norfolk S. Corporation,* 156 F.3d 701, 705–06 (6th Cir.1998), the Sixth Circuit held that *Meyer* does not bar *Bivens* actions against private entities engaging in federal action. The court criticized the *Kauffman* court's contention that deterrence is the primary goal of *Bivens,* and stated that while deterrence "is an important policy consideration," the main goal of *Bivens* "is to provide a remedy for victims of constitutional violation." *Id.* at 706 n. 10. The court also noted that under 42 U.S.C. § 1983, which "raise[s] identical concerns" as *Bivens,* corporations engaging in state action can be held liable for constitutional violations. *Id.* at 707. Thus, the court declined to "treat corporations that engage in federal action differently than corporations engaging in state action . . . ." *Id.* at 708.

The Sixth Circuit's opinion in *Hammons* represents the better reasoned approach. Both of the grounds for the Supreme Court's conclusion in *Meyer* are inapplicable in the case of a private entity defendant. First, because qualified immunity is available to all private defendants, whether entity or individual, *see infra* Section VI(E), the possibility of undermining deterrence by inducing plaintiffs to sue entities rather than individuals is not raised. One might object that plaintiffs will still concentrate their litigious efforts against entities due to their relatively deep pockets vis a vis individual private defendants. Such an objection unwittingly raises an even more important distinction from the

*Meyer* facts: with respect to private defendants, it will frequently be the case that suing entities will have *greater* deterrent effect than suing individuals. Unlawful action—presumed undertaken only by individual officers in the case of the government—can be taken by private entities on a corporate level. Disallowing a *Bivens* action against private entities has the perverse effect of encouraging the institutionalization of unconstitutional practices. Moreover, given that private entities are in a position to enact organization-wide policies and procedures, the threat of a *Bivens* suit against entities creates strong incentives for the actor that can prevent the greatest amount of unlawful conduct with the greatest ease.

Second, the Supreme Court's hesitation in *Meyer* to create potentially large federal financial responsibility is not implicated in the case of private defendants. Although receipt of federal funding is frequently one of the criterion noted in finding "federal action" on the part of a private defendant, such fiscal sponsorship does not implicate the federal treasury above and beyond amounts that Congress has already committed. Only in the rare case that the government agrees to indemnify a private defendant, such as here with respect to Brookhaven, is the possibility of a *Bivens* suit relevant to the federal budget. Yet in this case, the government has already made the positive decision to guarantee the private defendant's conduct—it has, in essence, already assumed the "potentially enormous financial burden for the Federal Government" that the Supreme Court hesitated to impose. *Meyer*, 510 U.S. at 486, 114 S.Ct. 996.

Thus, because the Supreme Court's reasoning in *Meyer* is inapplicable to the case of private entity defendants, the Court relies upon existing First Circuit precedent that appears to allow the use of *Bivens* against private entities. *See Gerena*, 697 F.2d at 452 (indicating that a *Bivens* suit would be allowed against a private entity,

a legal assistance corporation, if state action could be shown).

## C. Whether the Private Defendants Acted Under Color of Federal Law.

In light of the foregoing, the pertinent question as to all private defendants becomes whether any or all were engaged in conduct under color of federal law. The First Circuit has noted two separate ways in which the requisite government action may be determined. *See Barrios–Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico*, 84 F.3d 487, 492–94 (1st Cir.1996). First, government action may be found when the defendant is, for all practical purposes, a government agency. The most prominent case finding direct government action is *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374, 400, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), in which the Supreme Court determined that Amtrak was a government entity because when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Second, failing such direct government action, a private defendant may be found to have acted under color of law through one of several indirect government action tests. *See Barrios–Velazquez*, 84 F.3d at 492–94. Because the Court rules that government action is shown through the indirect tests, it need not address the *Lebron* direct test.

■ The First Circuit recently analyzed the various tests under which a private defendant may be found to have acted under color of law in the absence of direct government action. *See id.* at 493. These tests fall into three different categories of analysis: "(1) an elaborate financial or regulatory nexus between [the defendant] and [the government] ..., (2) an assumption by [the defendant] of a traditional public function, or (3) a symbiotic relationship

involving the sharing of profits." *Id.* The Court holds that federal action may be found on any of these three tests in the instant case.

The private defendants, however, argue that two of these tests ought quickly yield a result in their favor. First, although the plaintiffs contend that the private defendants assumed a traditional public function by operating a nuclear reactor, the private defendants argue that the function "traditionally exclusively reserved to the [government]," *id.* at 493–94, is that of energy production through the operation of nuclear reactors, *not* experimentation or research. Likewise, the private defendants believe that the "symbiotic relationship" test is not met because the Plaintiffs have not alleged that the United States shared in any profits obtained from the complained-of activity, nor have they alleged that the United States *mandated* the allegedly unconstitutional activity (namely, experimentation without obtaining informed consent). *See id.* at 494.

Both of these arguments are misplaced. First, the private defendants' distinction between energy production and experimentation does not control the traditional public function test. That test asks whether "the private entity assumed powers traditionally exclusively reserved to the State." *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 258 (1st Cir.1994) (internal quotations omitted). The use and control of radioactive substances presents a highly unusual factual setting. Under federal law, the possession and use of fissionable materials was not just traditionally reserved to the government, but was legally mandated to be reserved to the government. *See* Atomic Energy Act of 1946 §§ 4, 5 (prescribing that only the Commission could own a nuclear reactor that was capable of producing "within a reasonable period of time a sufficient quantity of fissionable material to produce an atomic bomb or any other atomic weapon" and only the Commission could own fissionable materials). In the view of Congress, there

were sound policy reasons for this exclusivity: one of the purposes of the Atomic Energy Act of 1946 was to provide "[a] program for Government control of the production, ownership, and use of fissionable material to assure the common defense and security ...." *Id.* at § 1(b)(4). Although the Act clearly contemplated private research activities under Commission supervision and allowed certain small-scale research facilities to be privately owned, such arrangements were required to "contain such provisions to protect health ... as the Commission may determine." *Id.* at §§ 3, 4. If, as the Plaintiffs allege, the Commission failed properly to fulfill its duty of supervision as to the boron neutron capture therapy experiments and indeed knowingly approved of experiments that violated the Commission's own professional guidelines, then it is arguable that the Commission "trie[d] to escape its responsibilities by delegating them to private parties." *Rockwell,* 26 F.3d at 258. In such a situation, the Court views the exclusive function test as met.

Second, although the private defendants argue that "[t]he absence of any 'financial partnership' between [Associated Universities] and the government mitigate strongly against a finding of [a symbiotic] relationship," Dkt. # 80 at 13, this contention ignores reality. As the plaintiffs point out, the work product of the partnership between Associated Universities and the Commission was knowledge. *See* Dkt. # 84 at 17. All such knowledge was subject to the ownership and control of the Commission. The Commission had the unilateral right to seek patents on all research results and the right to determine the ownership of such patents. *See* Dkt. # 81, Ex. 3 at 21. The Commission owned all tangible evidence of the research including specifications, medical records, designs, drawings, and data. *See id.* at 22. The Commission controlled when Associated Universities could publish the results of its research, *see id.* at 4, and when information needed to remain confidential, *see*

*id.* at 19–20. Finally, the Commission retained all income earned by Associated Universities that exceeded the operating costs of Brookhaven. *See id.* at 8. The private defendants complain that Brookhaven never generated any patents or other commercially valuable property and "that the government [never] expected to commercialize and profit from any breakthroughs in brain cancer treatment that resulted from BNCT research." Dkt. # 89 at 12. Commercial gain, however, is not the only motivating factor that could lead the government into a symbiotic relationship. It could equally have sought the luster of international scientific leadership, as evidenced by its encouragement of the publication of certain Brookhaven results, or the military advantage of superior knowledge of radiation effects, as evidenced by its insistence of control over disclosure matters.

Thus, the two factors identified by the First Circuit as mitigating against a finding of a symbiotic relationship—the lack of a financial partnership and the absence of enrichment of the parties as a result of the subject activities, *see Barrios–Velazquez,* 84 F.3d at 494—are notably absent here. Instead, it appears that the Commission "has so far insinuated itself into a position of interdependence with [Associated Universities] that it must be recognized as a joint participant in the challenged activity . . ." *Ponce v. Basketball Fed'n of the Com. Of Puerto Rico,* 760 F.2d 375, 381 (1st Cir.1985) (*quoting Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 [1961]). As the First Circuit has noted,

> What was crucial in *Burton* was not merely the contract between the private party and the government to lease property, but the fact that the restaurant "constituted a physically and financially integral . . . part of the State's plan to operate its project as a self-sustaining unit." *Burton v. Wilmington Parking Authority,* 365 U.S. at 723–4, 81 S.Ct. 856 . . . . The restaurant's racially dis-

criminatory policy was acknowledged to be indispensable to the success of the government's joint venture with the private party.

*Id.* In the instant case, Dr. Farr indicated that the success of the boron neutron capture therapy experiments depended on the Commission's approval of a plan to secure human subjects through the inducement of free care, and to test experimental techniques that were "not [ ] limited to any one, particularly one of whose value we as yet have no valid information." Dkt. # 85, Ex. 1. At this stage of the proceedings, it cannot be said that the Commission did not profit from those aspects of the experiment, which Dr. Farr himself stated to be "indispensable to the success of the government's joint venture with the private party." *Ponce,* 760 F.2d at 381. Thus, the Court holds that the private defendants' conduct satisfies the "symbiotic relationship" test for federal action.

The remaining indirect government action test requires a plaintiff to show the existence of an agreement or conspiracy between a government actor and a private party. *See Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Essentially, the analysis is whether, due to a sufficient nexus between the private defendants and the United States, "the challenged action of the regulated entity . . . may be fairly treated as that of the [United States] itself." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). More specifically, the test asks whether "the government exercised coercive power or provided such significant encouragement that the complained-of misconduct surrounding [the experimentation] must be deemed to be the conduct of the government." *Barrios–Velazquez,* 84 F.3d at 493.

The private defendants rightfully argue that government funding and supervisory authority are not enough to transform a private defendant into a federal actor. *See San Francisco Arts & Ath-*

*letics, Inc. v. United States Olympic Comm'n*, 483 U.S. 522, 543–44, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (congressional grant of corporate charter, imposition of requirements, and provision for funding of United States Olympic Commission did not make it a government actor); *Rendell–Baker v. Kohn*, 457 U.S. 830, 839–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (private school that received ninety percent of its funding from state and federal agencies and was subject to state and municipal oversight was not a state actor); *Yeo v. Town of Lexington*, 131 F.3d 241, 253–54 (1st Cir.1997) (noting that government action is not necessarily shown "even when the institution's budget is almost entirely derived from public money."). Nor does the fact that a private contractor has "significant or even total engagement in performing public contracts . . ." alone render that contractor a government actor. *Rendell–Baker*, 457 U.S. at 841, 102 S.Ct. 2764. Finally, government ownership of facilities used by a private actor does not necessarily lead to government action. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1336 (6th Cir.1992) (no state action when facility leased from state but no connection shown between lease and challenged conduct).

All of these factors combined, however, begin to articulate the type of interconnection that supports a finding of state action. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (noting that state action can be found when there is a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself"). Associated Universities was formed for the specific purpose of operating nuclear research facilities for the Commission. *See* Dkt. # 81, Ex. 1. Associated Universities was obligated to operate Brookhaven exclusively for the benefit of the Commission and with the Commission's approval. *See id.* at Ex. 3 at 3. The Commission owned the land, buildings, and leasehold improve-

ments that constituted Brookhaven's physical existence. *See* Dkt. # 85, Ex. 5 at 16 (Audited Financial Statements of Associated Universities) (noting that "title to [Brookhaven] assets remains vested in the United States Government"). The Commission was entitled to seek patents on all intellectual property arising out of Brookhaven research, to recommend the publication or suppression of all such research, and to receive all net income received from Brookhaven operations. *See* Dkt. # 81, Ex. 3 at 4, 8, 19–22. The Commission exercised significant control over the operations of Brookhaven, including a review of all expenditures by Associated Universities, *see id.* at 8–9, the right to inspect all documents generated by Associated Universities, *see id.* at 12, the right to inspect the Brookhaven facility and experiments in any manner and at any time, *see id.* at 20, the right to require reports on Brookhaven work, *see id.*, and the right to terminate the parties' agreement at any time for any reason, *see id.* at 25. Finally, the Commission agreed to indemnify Associated Universities for all liability claims, absent bad faith or willful misconduct on the part of Associated Universities. *See id.* at 15. Thus, in a very real sense, Brookhaven National Laboratory was a joint venture between Associated Universities and the Atomic Energy Commission. The government action determination in this case does not involve a matter of mere government funding or regulation—it involves an active partnership between a federal agency and a private research group convened for the very purpose of joining the partnership.

The crucial question then becomes whether the elaborate financial and regulatory nexus between Associated Universities and the Commission is such that the Commission "exercised coercive power or . . . provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977, 986, 143 L.Ed.2d 130 (1999)

(*quoting Blum,* 457 U.S. at 1004, 102 S.Ct. 2777). Taken from the opposite angle, the question is whether the challenged conduct at Brookhaven was "[a]ction taken by private entities with the mere approval or acquiescence of the State . . . ," rather than with active coercion or encouragement. *Id.* In essence, the government involvement must be particularly related to the conduct that is challenged as unconstitutional.

Highly relevant to this analysis is the letter of demand from Dr. Farr indicating that, as a condition of his employment, he required the Commission to approve the use of free care as an inducement to obtain experimental patients and the use of experiments not limited in scope to those with proven value. *See* Dkt. # 85, Ex. 1. The initial application for the experiments contained a disclosure that patients with only a few months to live would be used in the trials. *See id.,* Ex. 2. Furthermore, taking the evidence in the light most favorable to the Plaintiffs, the Commission continuously authorized funding for research projects that at least tacitly admitted that the boron neutron capture therapy experiments violated the Commission's own guidelines for medical experimentation. *See* Dkt. # 81, Exs. 18, 20. Coupled with the Commission's admitted ultimate responsibility for the conduct of all Brookhaven experiments, *see* Dkt. # 85, Ex. 7 at 10–12, this knowledge and apparent encouragement of the experimental activities allows the Court reasonably to conclude that Associated Universities was a government actor for *Bivens* purposes.

Thus, the Court holds that the private defendants can be considered government actors for purposes of the *Bivens* claim.

D. *Whether the Plaintiffs Have Alleged Violations of a Constitutional Right.*

■ Following the Supreme Court's analysis of qualified immunity in *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), dismissal is appropriate in a section 1983 or *Bivens* action if any of the following circumstances are present: (1) the complaint fails to allege a violation of a statutory or constitutional right; (2) the right was not clearly established at the time of the alleged conduct; or (3) the defendant's conduct was such that a reasonable official in her position would not know that the conduct would violate the right. Of these considerations, the question that must be addressed first is whether a violation of a constitutional right has been adequately alleged. *See Siegert v. Gilley,* 500 U.S. 226, 235, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (noting that "[a] necessary concomitant" to the qualified immunity determination "is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."); *Aversa v. United States,* 99 F.3d 1200, 1215 (1st Cir.1996) (noting that "[a] court may . . . bypass the qualified immunity analysis if it would be futile because current law forecloses the claim on the merits."). The Plaintiffs offer five constitutional grounds for their *Bivens* claim, focusing on substantive and procedural due process rights to bodily integrity, access to the courts, freedom from unlawful deprivations of property and unreasonable searches and seizures, and privacy.

1. *Bodily Integrity.*

■ "The right to be free of state-sponsored invasion of a person's bodily integrity is protected by the [constitutional] guarantee of due process." *In re Cincinnati Radiation Litig.,* 874 F.Supp. at 810–11. As the Supreme Court has noted, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and *the right to bodily integrity.*" *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (*citing Planned Parenthood v. Casey,* 505 U.S. 833, 847–49, 112 S.Ct. 2791, 120 L.Ed.2d 674 [1992] ) (emphasis added). Such a right has been long-recognized.

*See Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) (holding that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); *Skinner v. State of Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (holding that forced sterilization deprived recipient of a "basic liberty"); *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (stating that "[t]he integrity of an individual's person is a cherished value of our society.").

Three district courts have ruled that the right to bodily integrity includes protection from government-sponsored radiation experiments that have no therapeutic value and are not disclosed as such. *See Bibeau v. Pacific Northwest Research Found.,* Case No. 95–06410 (D.Oreg. Sept. 27, 1996), *dismissed on other grounds,* 980 F.Supp. 349 (1997); *Stadt v. Univ. of Rochester,* 921 F.Supp. 1023, 1027–28 (W.D.N.Y.1996); *In re Cincinnati Radiation Litig.,* 874 F.Supp. at 810–11. These well-reasoned opinions argue that the failure to disclose the alleged true nature of the experiments—that they were conducted with no expectation of therapeutic value to the patients but rather only to observe the effects of radiation on human subjects—vitiates any "consent" that may have been given, thereby rendering the experiments similar to the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional. *See Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (forced administration of antipsychotic medication during trial violated Fourteenth Amendment); *Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (noting that "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.");

*Winston v. Lee,* 470 U.S. 753, 766–67, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (potentially harmful, nonconsensual surgical intrusion into suspect's chest to recover bullet without compelling need unreasonable under Fourth Amendment); *Rochin v. People,* 342 U.S. 165, 172–74, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (government's conduct in forcibly extracting drugs from defendant's stomach violated the Fifth Amendment); *Skinner,* 316 U.S. at 541, 62 S.Ct. 1110 (forced sterilization unconstitutional).

The Supreme Court balances invasions of an individual's interest in bodily integrity against the state's interests in pursuing its invasive conduct. Frequently, this balance comes out in favor of state intervention. *See Washington,* 494 U.S. at 216, 110 S.Ct. 1028 (administering antipsychotic medication during trial held reasonable when objective outside physician reviewed all decisions); *Schmerber,* 384 U.S. at 772, 86 S.Ct. 1826 (blood tests of auto accident victim for alcohol content conducted in hospital held reasonable); *Jacobson v. Massachusetts,* 197 U.S. 11, 30, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory vaccinations for smallpox upheld over religious objection). The alleged conduct in the instant litigation, however, falls within that class of cases, "deficient in procedural regularity, or ... needlessly severe," *In re Cincinnati Radiation Litig.,* 874 F.Supp. at 813, that is held to constitute an unreasonable invasion of bodily integrity. The Plaintiffs have alleged that government actors affirmatively misled their decedents regarding the boron neutron capture therapy treatments to secure their participation in experimental trials, that the subjects were exposed to radiation for purposes unrelated to any possible therapeutic benefits to them, and that the private defendants subsequently suppressed all information regarding these aspects of the experiments. Failure to provide adequate disclosure of a potentially deadly medical experiment to subjects who were induced to participate on the basis of fraud constitutes a procedural ir-

regularity sufficient to trigger the protections of the Fifth Amendment. Moreover, the consequences in this case were needlessly severe. The Plaintiffs allege that their decedents suffered serious physical side-effects from the therapy, including advanced onset of death. The government's interest in utilizing false promises of therapeutic value was presumably to obtain participants for the experiments. Such an interest, even if it were considered legitimate, is insufficient to overcome the gravity of harm allegedly suffered by the Plaintiffs' decedents.

The private defendants contend that *Heinrich II* compels a decision that no constitutional violation has been alleged with respect to invasions of bodily integrity. Specifically, the private defendants argue that because this Court dismissed the Plaintiffs' claims for battery (on the ground that they stated a claim for lack of informed consent that had to be brought under the state medical malpractice statute) and strict liability for ultrahazardous activities (on the ground that the harm could be avoided by obtaining informed consent), the Court implicitly endorsed the argument that the Plaintiffs have *only* stated a claim for lack of informed consent and not the involuntary invasions of bodily integrity that have been found to violate the Due Process Clause. The private defendants further argue that if "involuntary invasions" were taken to include medical treatment that is not accompanied by informed consent, then all of state medical malpractice law would be converted to a constitutional cause of action.

This argument misconstrues the Court's reasoning. The Plaintiffs have alleged at least two factual grounds on which all of their claims are based: (1) that informed consent was not obtained, and (2) that the purported medical experiments were known to have no therapeutic value and were indeed harmful. The implication, if any, of *Heinrich II* is merely that both of these conditions can be present and the Plaintiffs will still have stated a claim only

for medical malpractice under state law. Just as lack of informed consent does not convert a medical malpractice claim into a battery claim, lack of therapeutic value does not strip the radiation treatments of their medical context and automatically change them into a state law battery. Likewise, strict liability for ultrahazardous activities is an inappropriate doctrine in this case because obtaining informed consent would eliminate the harm of experimental treatments, *even if* they are known to lack therapeutic value for the immediate subject. In short, *Heinrich II* ought be understood as holding that, under the law of Massachusetts and New York, medical experimentation should be analyzed under the legal standards governing ordinary medical treatment. *See* Karine Morin, The Standard of Disclosure in Human Subject Experimentation, 19 J. Legal Med. 157, 202 (1998) (noting that American courts traditionally review claims of inadequate disclosure in the experimental context using the familiar medical malpractice rubric).

This does not, however, obviate the possibility that medical experimentation conducted under false pretenses by government actors can rise to the level of a constitutional violation. Thus, a determination that the Plaintiffs have alleged a violation of their decedents' constitutionally protected right to be free from invasions of bodily integrity is not inconsistent with the Court's earlier dismissal of the battery and strict liability for ultrahazardous activity claims. Nor does it result in the constitutionalization of all state medical malpractice claims. The crucial elements of the constitutional violation are that (1) a (government) actor, (2) without obtaining informed consent and utilizing false pretenses to obtain participation, (3) conducted medical experiments known to have no therapeutic value and indeed known to be possibly harmful to the subjects. These elements are far more restrictive than the ordinary medical malpractice action for lack of informed consent that only requires

the nondisclosure of a material risk of a medical procedure.

The Court thus holds here that the Plaintiffs have alleged facts sufficient to state a claim for violation of the constitutionally protected liberty interest in bodily integrity.

### 2. *Access to the Courts.*

The Plaintiffs contend that the private defendants violated their right of access to the courts by denying them access to information necessary to have a reasonable suspicion that a wrong was done to them and their decedents. "It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution." *Graham v. National Collegiate Athletic Ass'n,* 804 F.2d 953, 959 (6th Cir.1986). As early as 1907, the Supreme Court recognized the importance of the right of access to the courts:

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens.

*Chambers v. Baltimore & Ohio R.R. Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907) (right of access is a privilege and immunity secured under article IV of the Constitution and the Fourteenth Amendment); *accord Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right of access is founded in the Due Process Clause); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (right of access is one aspect of First Amendment right of petition). Thus, a constitutional violation of the right of access occurs when:

> [S]tate officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled. . . .

*Crowder v. Sinyard,* 884 F.2d 804, 812 (5th Cir.1989), *abrogated on other grounds, Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *see also Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1427 (8th Cir. 1986); *Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983); *Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir.1979); *McCray v. Maryland,* 456 F.2d 1, 6 (4th Cir.1972); *Harris v. Pate,* 440 F.2d 315, 317–18 (7th Cir.1971). A plaintiff's due process rights are not violated, however, "[w]here the actions of a defendant cause a delay in the plaintiff's prosecution of his suit, but not dismissal of the suit or some other concrete legal injury to plaintiff. . . ." *Branch Int'l Servs., Inc. v. Budde,* 890 F.Supp. 659, 665 (E.D.Mich.1995). The Supreme Court has noted that where government action results in "only delay" and not in "total deprivation" of access to the courts, no due process violation is shown. *Sosna v. Iowa,* 419 U.S. 393, 410, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

The focus of any right of access analysis, then, is whether the defendant's actions denied the plaintiff adequate, effective, and meaningful access to the courts. A crucial factor in that analysis is the length of delay that the defendant's alleged cover-up caused the plaintiff to suffer in bringing her claim. The longer the delay, the more likely it is considered that the defendant's actions resulted in constitutionally cognizable harm to the plaintiff. *See, e.g., Bell v. City of Milwaukee,* 746 F.2d 1205, 1261–62 (7th Cir.1984) (holding that cover-up which caused a twenty-year delay violated plaintiffs' right of access to the courts); *Ryland,* 708 F.2d at 973–74 (holding that cover-up causing an eleven-month delay stated a claim for a violation of plaintiffs' right of access to the courts);

*In re Cincinnati Radiation Litig.*, 874 F.Supp. at 824 (holding that cover-up which caused a twenty-two to thirty-four-year delay violated plaintiffs' right of access to the courts); *Fisher v. City of Cincinnati*, 753 F.Supp. 681, 686–87 (S.D.Ohio 1990) (holding that one-year delay violated plaintiff's right of access to the courts). By the same token, delays of a shorter duration may be found nonactionable because they result in only insignificant harm to the plaintiff. *See Sowell v. Vose*, 941 F.2d 32, 35 (1st Cir.1991) (no violation when only injury from delays was plaintiff's need to seek extensions of filing deadlines and such extensions were granted); *Crowder*, 884 F.2d at 812 (noting that "concealment and the delay engendered by it" must "substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled").

█ The delays alleged in the instant litigation range between three and four decades. In a very similar case, Judge Beckwith of the Southern District of Ohio found that, in that case, the plaintiffs' "claims [had] been substantially compromised by the [private defendants'] conduct in concealing the true purpose and dangers associated with the Human Radiation Experiments" because, in the intervening decades, "crucial evidence may have been lost, many witnesses may have died or otherwise become unavailable, and certainly many witnesses' memories have faded." *In re Cincinnati Radiation Litig.*, 874 F.Supp. at 824. The Plaintiffs in this case, however, have alleged no such prejudice. Rather they merely argue that "they [may] lose their right to sue because of the application of the statute of limitations." Dkt. # 52 at 36. With respect to the federal claims at issue in this case, *Heinrich I & Heinrich II* foreclose that argument by holding that the discovery rule tolled the statute of limitations period. Nevertheless, because several state law claims, particularly those governed by New York statutes of limitations, have been ruled time-barred, the Plaintiffs have shown sufficient prejudice to state a constitutional claim resulting from the alleged efforts of the private defendants to conceal the existence of the Plaintiffs' causes of action.

### 3. *Deprivation of Property.*

█ The Supreme Court has long recognized that a cause of action is a species of property protected by the Due Process Clause. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). As far back as 1882, the Supreme Court held that a "vested right of action is property in the same sense in which tangible things are property, and is equally protected against arbitrary interference." *Pritchard v. Norton*, 106 U.S. 124, 132, 1 S.Ct. 102, 27 L.Ed. 104 (1882). Thus, any government action that substantially and unreasonably interferes with an individual's cause of action or precludes her opportunity to be heard violates procedural due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–19, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (holding that state must provide actual notice to known potential claimants in bankruptcy proceedings). The plaintiffs in any action complaining of such conduct, however, must allege that "their claims have been substantially compromised" because, for example, "crucial evidence has been lost...." *In re Cincinnati Radiation Litig.*, 874 F.Supp. at 825 (finding that loss of witnesses due to concealing purpose of radiation experiments could amount to violation of procedural due process). As with the right of access claim, the dismissal under the New York statutes of limitations of several of the state law causes of action constitutes prejudice sufficient to state a claim for violation of the constitutional right to be free from deprivations of property without procedural due process.

### 4. *Unreasonable Search and Seizure.*

█ The Plaintiffs also allege that the private defendants' conduct "violated the

Fourth Amendment's proscription against unreasonable searches and seizures...." Dkt. #21 at ¶ 91(c). By its plain language, however, the Fourth Amendment only applies to "searches and seizures." *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998). "Only rarely ... has the [Supreme] Court considered the nature of fourth amendment restrictions on the conduct of government officials in noncriminal investigations. Even rarer are the instances in which the Court has considered the application of the fourth amendment to noncriminal noninvestigatory governmental conduct." *United States v. Attson,* 900 F.2d 1427, 1430 (9th Cir.1990) (citation omitted). To determine whether the actions of a private party acting in concert with government officials constitutes a search or seizure within the meaning of the Fourth Amendment, the purposes of the actions must be ascertained:

> Under the proper factual circumstances, ... governmental conduct that is motivated by investigatory or administrative purposes will fall within the scope of the fourth amendment since such conduct constitutes a search or seizure, the type of conduct that is regulated by the amendment. This, in turn, implies that governmental conduct which is not actuated by an investigative or administrative purpose will not be considered a "search" or "seizure" for purposes of the fourth amendment.

*Id.* at 1430–31. Thus, conduct that serves an investigative or administrative purpose, such as determining compliance with statutory or regulatory codes, has been found to fall within the scope of the Fourth Amendment. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (drug tests by government employers); *New Jersey v. T.L.O.,* 469 U.S. 325, 333, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (investigative searches by school officials); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 315, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (OSHA inspections); *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (building inspections).

The challenged conduct in the instant case cannot be said to have been motivated by investigative or administrative concerns. The government and private actors were not conducting criminal or regulatory investigations. Rather they were conducting *medical* and *scientific* investigations of the effects of certain radiation treatment on human subjects. The Plaintiffs have pointed to no case that would suggest that such experimentation is the type of government conduct covered by the Fourth Amendment. Thus, at oral argument on May 25, 1999, the Court GRANTED the motions to dismiss the claim of violation of the Fourth Amendment prohibition on unreasonable searches and seizures.

5. *Privacy.*

Finally, the Plaintiffs claim that their right of privacy was violated by the experimental treatments imposed upon their decedents. The Supreme Court, however, has indicated that the analogous right to refuse medical treatment is better analyzed under the Due Process Clause than some "generalized constitutional right of privacy." *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 279 n. 7, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) ("Although many state courts have held that a right to refuse treatment is encompassed by a generalized constitutional right of privacy, we have never so held. We believe this issue is more properly analyzed in terms of a Fourteenth Amendment liberty interest."). Likewise, the question of whether Plaintiffs' decedents had a constitutionally protected right to full disclosure of the experimental nature of the boron neutron capture therapy treatments is properly analyzed as a question of substantive due process. *See supra* Section VI(D)(1). Thus, at oral argument on May 25, 1999, the Court GRANTED the mo-

tions to dismiss the claim of violation of the Plaintiffs' right to privacy.

### E. Whether the Private Defendants are Entitled to Qualified Immunity.

### 1. Whether Any Private Defendants May Claim Qualified Immunity.

██ The private defendants argue that they are entitled to summary judgment based on qualified immunity because the constitutional rights alleged to have been violated were not clearly established at the time of the relevant conduct. The Plaintiffs contend in their turn that the doctrine of qualified immunity does not apply to private actors. In *Wyatt v. Cole*, 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Supreme Court noted that the rationale behind the qualified immunity rule under section 1983 did not apply to certain private parties because they are not invested with the government policy-making responsibility that triggers the Court's traditional measure of liability protection. Therefore, the Court held that qualified immunity was not available for a private party invoking a state replevin statute later held unconstitutional. *See id.* at 169, 112 S.Ct. 1827.

As the Sixth Circuit has noted on more than one occasion following the *Wyatt* decision, the Court's reasoning can also be applicable to private actors in *Bivens* cases. *See Hammons*, 156 F.3d at 707 (noting that "a private actor found liable under *Bivens*, unlike a public official, would not be entitled to qualified immunity."); *Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698–99 (6th Cir.1996) (holding that "a party not a public official may be liable under *Bivens*, but not entitled to qualified immunity because the reason for affording qualified immunity to a public official does not apply to a government actor who is not a public official."); *see also F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1319 (9th Cir. 1989) (holding that private parties are not entitled to qualified immunity in a *Bivens* action). Immunity issues have traditional-

ly been afforded parallel treatment under section 1983 and *Bivens*. *See Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (deeming it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."); *F.E. Trotter, Inc.*, 869 F.2d at 1318 (stating that "the scope of immunity available to a private party in a *Bivens* action mirrors that available to a private defendant in a section 1983 action."). Therefore, the Plaintiffs argue that the Supreme Court's determination in *Wyatt* that private parties cannot invoke qualified immunity under section 1983 compels a decision that such parties receive no protection in *Bivens* claims.

The Plaintiffs fail to parse the *Wyatt* decision with requisite particularity. The Supreme Court in *Wyatt* was careful to note that it was only deciding the "precise issue" of whether private parties acting pursuant to a state garnishment, replevin, or attachment statute could invoke qualified immunity. *Wyatt*, 504 U.S. at 168–69, 112 S.Ct. 1827. Unlike the Sixth Circuit, other Courts of Appeals have indicated that the *Wyatt* decision only bars qualified immunity when the private defendant is acting purely out of self-interest and not engaging in a quasi-public activity. *See Buckner v. Toro*, 116 F.3d 450, 453 n. 1 (11th Cir.1997); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405 (7th Cir.1993). Among these courts is, apparently, the First Circuit, which recently held that a private psychiatrist acting in concert with a police department was entitled to qualified immunity:

A private party's conduct is attributable to the state if the state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.... [T]he psychiatrists ... are for purposes of this case state actors performing in concert with the [police] department. As such,

they are both subject to suit under section 1983 and eligible for the balm of qualified immunity.

*Camilo–Robles v. Hoyos,* 151 F.3d 1, 10 (1st Cir.1998) (internal citations and quotations marks omitted). Thus, because the private defendants in this case were engaging in matters of public concern rather than merely acting out of self-interest pursuant to something like a garnishment statute, the Court follows *Camilo–Robles* in holding that the private defendants are entitled to seek qualified immunity.

2. *Whether the Right to Bodily Integrity Was "Clearly Established."*[14]

■■■■ The Supreme Court's decision in *"Harlow* requires that [a district court] examine two issues: (1) whether at the time of the alleged conduct there was a clearly established constitutional right that was violated; and (2) whether a reasonable person would have known that her conduct violated that constitutional right." *Frazier v. Bailey,* 957 F.2d 920, 929 (1st Cir.1992). Significantly, "a plaintiff must allege more than conduct that violates an 'abstract' constitutional principle; he must plead with particularity a concrete constitutional right." *Id.* Moreover, "not every transgression of state law does double duty as a constitutional violation." *Fournier v. Reardon,* 160 F.3d 754, 757 (1st Cir.1998).

■■■ The Plaintiffs cite three federal district court cases for the proposition that "at the time of the human radiation experiments, such as those involved here, the right to bodily integrity was a clearly established substantive due process constitutional right which would be violated by subjecting individuals to radiation experiments either secretly (toxic injections) or

under the false guise of medical therapy (whole body radiation presented as medical therapy when in fact there was no reason to believe it would be therapeutic)." Dkt. # 52 at 31. First, in *In˙ re Cincinnati Radiation Litig.,* Judge Beckwith concluded:

[t]he conduct attributed to the individual ... [d]efendants ... strikes at the very core of the Constitution. Even absent the abundant case law that has developed on this point since the passage of the Bill of Rights, the Court would not hesitate to declare that a reasonable government official must have known that by instigating and participating in the experimental administration of high doses of radiation on unwitting subjects, he would have been acting in violation of those rights. Simply put, the legal tradition of this country and the plain language of the Constitution must lead a reasonable person to the conclusion that government officials may not arbitrarily deprive unwitting citizens of their liberty and their lives.

*In re Cincinnati Radiation Litig.,* 874 F.Supp. at 815. Likewise, in *Stadt,* Judge Telesca held that "under the plain language of the Fifth Amendment to the Constitution, the plaintiff had a clearly established right in 1946 to be free from being injected with plutonium by the government without her consent." *Stadt,* 921 F.Supp. at 1027. Finally, in *Bibeau,* Judge Hogan held that "plaintiffs had a clearly established right to bodily integrity during the time of the experiments [1963–73] such that the defendants should have known that their alleged conduct, if it occurred, would violate the Constitution." *Bibeau,* No. 95–6410, slip. op. at 29.

---

14. The Plaintiffs' other two constitutional claims, involving substantive and procedural due process rights of access to the courts, were "clearly established" at the time of the alleged conduct. First, with respect to a substantive right of access to the courts, several Courts of Appeals have traced its existence to the 1907 *Chambers* case. *See Crowder,* 884 F.2d at 811 n. 7; *Graham,* 804 F.2d at 959;

*Ryland* 708 F.2d at 971; *McCray,* 456 F.2d at 6. Second, as the Supreme Court has noted, ˙the question of procedural due process protection of the right of access was decided in 1950 by "the *Mullane* case ..., where the Court held that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan,* 455 U.S. at 428, 102 S.Ct. 1148.

The private defendants contend that such a right could not have been clearly established during the 1950s and 1960s because the common law doctrine of informed consent did not develop until after that time. *See, e.g., Halley v. Birbiglia,* 390 Mass. 540, 545, 458 N.E.2d 710 (1983) ("[T]he theory of informed consent was not explicitly recognized in Massachusetts until 1982 . . . ."). This argument again conflates the alleged constitutional violations at issue in this case with a standard breach of the duty of informed consent. It is not merely the fact that the private defendants conducted medical treatments on the Plaintiffs' decedents without their consent that gives rise to a constitutional claim in this case; rather, it is also the fact that the subjects were allegedly deceived into participating in a medical experiment known to have no prospect of therapeutic value for them. It may well be that a government actor providing ordinary medical services to a patient could not reasonably have foreseen a duty of informed consent in the 1950s. The same actor should have known, however, that scientific experiments designed to ferret out all of the harmful effects of radiation on human "guinea pigs" would be unconstitutional if conducted without full and fair disclosure of the nature of the experiments.

Equally unavailing is the private defendants' contention that the constitutional right to refuse medical treatment was not established until the late 1970s. The right to refuse medication is again premised on a set of facts in which the medication being refused is potentially beneficial. The right to be free from harmful radiation treatments whose therapeutic value was affirmatively misrepresented in an effort to secure unwitting human participants is an altogether different liberty interest subject to a different historical evolution.

Finally, the private defendants contend that the very doctrine of substantive due process was not revived until 1965 in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), in which the Court struck down a state statute banning married couples' use of contraceptives. *See id.* at 528–31, 85 S.Ct. 1678 (Stewart, J., dissenting) (arguing that the doctrine of substantive due process was dead between 1940 and 1965). The private defendants argue that if two dissenting Justices of the Supreme Court believed that substantive due process was a dormant doctrine during the time of the radiation experiments, the "[P]laintiffs certainly cannot meet their burden of establishing that no officer 'might reasonably have come to the conclusion,' that the particular substantive due process rights asserted by the [P]laintiffs were not protected by the Constitution." Dkt. # 89 at 16 (*quoting Hoffman v. Reali,* 973 F.2d 980, 986 [1st Cir.1992] ).

This argument depends on the view that the constitutional right asserted in this case was not "clearly established" by Supreme Court cases decided before *Griswold.* At least two cases decided before 1953, however, established the plain notion that when a government invasion of the bodily integrity of an individual "shocks the conscience," a constitutional violation has occurred. *Rochin,* 342 U.S. at 169, 72 S.Ct. 205 (forced extraction of stomach contents unconstitutional); *see also Skinner,* 316 U.S. at 538, 62 S.Ct. 1110 (forced sterilization unconstitutional). Similar conduct that "shocks the conscience" includes the use of false promises of therapeutic hope to terminally ill patients in order to lure them into becoming human subjects in experiments designed to test the effects of radiation, all for the benefit of curious scientists rather than the health of the test subjects. The private defendants believe that the involuntary nature of the *Rochin* and *Skinner* bodily invasions renders those cases distinguishable from the present case in which consent, albeit uninformed, was obtained. Not so. Believing that the government can do indirectly by making fraudulent representations, what it cannot do directly by force, is an unreasonable interpretation of the

Constitution.[15] Any officer who so argued, even in the 1950s and 1960s, ought not be entitled to qualified immunity.

This case must be understood in its historical context. Just a few years prior to the commencement of the boron neutron capture therapy trials, the United States played a central role in the prosecution of Nazi physicians for war crimes, including their extensive experimentation on unwilling prisoner subjects. *See United States v. Carl Brandt, et al.,* II Trials of War Criminals, Vol. 10 at 181 (1949). The judgment coming out of that case, delivered on July 19, 1947, has become known as the Nuremberg Code:

> The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion and should have sufficient knowledge and comprehension of the elements of the subject matter involved to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health and person which may possibly come from his participation in the experiment.
>
> The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages in the experiment. It is a personal duty and responsibility

which may not be delegated to another with impunity.

*In re Cincinnati Radiation Litig.,* 874 F.Supp. at 820 (quoting judgment). As Judge Beckwith noted, "It is inconceivable to the Court that the ... [d]efendants, when allegedly planning to perform radiation experiments on unwitting subjects, were not moved to pause or rethink their procedures in light of the forceful dictates of the Nuremberg Tribunal and the several medical organizations [that followed its lead by prescribing guidelines for experimentation]." *Id.* at 821–22. Thus, at the very least, the judgment of the Nuremberg Tribunal regarding fundamental legal principles of human subject experimentation served as an explicit international declaration that the conduct alleged in this case "shocked the conscience" within the meaning of Justice Frankfurter's words in *Rochin.* This Court holds that qualified immunity does not apply to the alleged violations of the constitutional right to bodily integrity.

## VII. *Federal Tort Claims Act.*

 The Federal Tort Claims Act (the "Claims Act") represents one example of Congress' intent to create an express waiver of sovereign immunity in certain tort cases. *See United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). This waiver is subject to various exceptions, *see id.,* including the discretionary function and independent contractor exceptions. When these exceptions to the Claims Act apply, a court lacks subject matter jurisdiction to hear the plaintiff's claims against the United States. *See Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Miller v. George Arpin & Sons, Inc.,* 949 F.Supp. 961, 966 (D.R.I.1997).

### A. *Independent Contractor Exception.*

 The Claims Act provides a cause of action against the United States for

---

**15.** The Plaintiffs have also alleged that the private defendants accomplished such constitutional violations directly, by secretly injecting several patients with toxic substances, including boron and uranium, without their knowledge or consent. *See* Dkt. # 21 ¶ 36(a).

injury "caused by the negligent or wrongful act or omission of *any employee of the Government* ...." 28 U.S.C. § 1346(b)(1) (emphasis added). The term "employee of the government" includes "persons acting on behalf of a federal agency ...," but specifically excludes "any contractor with the United States." 28 U.S.C. § 2671. Therefore, the United States is not liable for the negligence of an independent contractor's employee. *See Brooks v. A.R. & S. Enters., Inc.*, 622 F.2d 8, 10 (1st Cir. 1980). The United States asks this Court to dismiss the Plaintiffs' claims insofar as they relate to the alleged negligence of Associated Universities employees because Associated Universities was an independent contractor.

■■■■ In determining whether a contractor acts on behalf of a federal agency, a court must examine "whether its day-to-day operations are supervised by the Federal Government." *Orleans v. United States*, 425 U.S. 807, 815, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *accord Brooks*, 622 F.2d at 11 ("[T]he critical question is ... whether the United States directs the manner in which the contractor carries out its obligations under the contract."). The focus of this inquiry is "the authority of the principal to control the detailed physical performance of the contractor." *Logue v. United States*, 412 U.S. 521, 527–28, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). For instance, a contractor's use of government-owned property does not, by itself, transform that contractor into an agent of the government. *See Brooks*, 622 F.2d at 11. If, however, the government supervises or controls the manner in which the contractor uses government property, the contractor may in fact be acting on behalf of the government. *See id.* Likewise, while the United States' general right to inspect does not subject the government to liability for its contractors' torts, *see id.* at 12, evidence of the United States' "daily supervision and inspection of the activities of the [contractor may] satisfy the test of liability under *Orleans*," *id.* at 11.

Under the contract between Associated Universities and the government for the operation of Brookhaven National Laboratory, Associated Universities had the following duties: (1) making all necessary provisions (including the hiring of personnel) for the establishment, operation, and maintenance of Brookhaven National Laboratory; (2) the design, engineering, construction, and alteration of the buildings, facilities, and utilities; (3) the operation, management, and maintenance of the laboratory; (4) the conduct of research and development in the atomic and related fields described in Section 3 of the Atomic Energy Act of 1946; (5) providing the facilities to the personnel of public and private scientific institutions for the conduct of research and development; (6) maintenance of the necessary guard and fire-fighting forces for the laboratory; (7) training of scientific and technical personnel, and (8) dissemination and publication of unclassified scientific and technical data developed in the course of work. *See* Dkt. # 81, Ex. 3 at 3–4.

As already extensively described throughout this opinion, the record reveals that the Commission was intertwined with the execution of most of these duties. Moreover, the Task Force Report makes clear the hands-on relationship between the Commission and Associated Universities. According to the report, the Commission exercised its control in the following manner:

> The primary instruments for determining and controlling the contractor's work are the program assumptions which are the basis for planning, the budget submissions, the approved financial plans, and directives authorizing specific projects. Continuing control to assure that the contractor adheres to established programs is exercised through such devices as monthly cost reports, regular progress reports, conferences with the contractor, review and observation of the work by [Commission] engineers and

other specialists, inspection of finished products, and audits.

\* \* \* \* \* \*

Inspection involves an overall and up-to-date familiarity with the nature and progress of the work which is gained by *daily observation,* close contact with contractor personnel, examination of the reports and cost statements, review of proposed procurement and sub-contract actions, and regular conferences with contractor top management regarding progress and difficulties.... Such inspection appears to us necessary for the discharge of inherent AEC responsibility ...

Dkt. # 85, Ex. 7 at 10, 17 (emphasis added). A Commission officer also explained at a symposium that the Commission and its contractors are "partners in the general sense of the word." *Id.* at Ex. 8 at 19. Indeed, the Commission even agreed to indemnify Associated Universities for all liability awards issued against it, including personal injury awards, barring bad faith or willful misconduct on the part of Associated Universities. *See* Dkt. # 81, Ex. 3 at 15.

 The relationship between the Commission and Associated Universities went beyond the general supervisory relationship between a principle and an independent contractor. The Commission controlled almost every aspect of Brookhaven National Laboratory, from its expenses to its research goals to its output. The regular supervision and inspection involved the substance of Associated Universities' work, not just its compliance with the terms of the contract. For these reasons, this Court holds that Associated Universities was not an independent contractor but an entity acting on behalf of a government agency. *See Costa v. United States,* 845 F.Supp. 64, 68 (D.R.I.1994) (concluding that a clinic doctor who used a veteran hospital's equipment and was bound by its bylaws, policies, and procedures was an employee rather than an independent contractor for purposes of the Claims Act).

## B. *Discretionary Function Exception*

 The discretionary function exception to the Claims Act provides that the government is not liable for

[a]ny claim based upon an act or omission of an employee of the Government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). As its name suggests, the exception only covers acts that are discretionary in nature. *See United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Discretionary acts are those involving an element of judgment or choice. *See id.* An act is not discretionary if a federal statute, regulation, or policy mandates a course of action for an employee to follow, because "the employee has no rightful option but to adhere to the directive." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. "[A]ssuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Because the basis for the exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economical, and political policy through the medium of an action in tort," *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy," *Berkovitz,* 486 U.S. at 537.

 The First Circuit recently discussed the proper framework for determining whether the discretionary function exception applies. *See Shansky v. United*

*States,* 164 F.3d 688, 690–91 (1st Cir.1999). First, an inquiring court must identify the conduct that allegedly caused the harm. *See id.* In this case, the Plaintiffs allege that the government:

- Used boron neutron capture therapy on terminal brain cancer patients with no reasonable basis to believe the treatment would provide therapeutic benefit or that the benefits would outweigh the risks;

- Injected patients with toxic substances for which there was no conceivable therapeutic purpose for that patient and which injections were not given as part of a radiation exposure for that patient;

- Affirmatively misled the patients who were subjected to the BNCT experiments by telling them that there was a reasonable basis to believe the experiment would produce a therapeutic benefit and that the benefit would outweigh the risks; and

- Failed to obtain informed consent of any patient prior to injecting that patient with a toxic substance when the injection was not part of a radiation exposure experiment for that patient.

*See* Dkt. # 21 at ¶¶ 2–4. Having identified the alleged conduct, this Court must next determine "whether this conduct is of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability. That issue encompasses two questions: Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments?" *Shansky,* 164 F.3d at 691.

### 1. *Is the Conduct Discretionary?*

▇▇ As noted above, challenged conduct is not discretionary if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *See Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. The Plaintiffs argue that a Commission policy explicitly prohibited non-therapeutic experimental treatment and treatment without informed consent.

The Plaintiffs rely on an April 30, 1947 letter from Carroll Wilson ("Wilson"), General Manager of the Commission, to Dr. Stafford Warren, Dean of the UCLA Medical School and head of the Commission's Interim Medical Advisory Committee. In the letter, Wilson expressed the Commission's understanding of the Brookhaven program. That understanding included a provision that "treatment (which may involve clinical testing) will be administered to a patient *only when there is expectation that it may have therapeutic effect.*" Dkt. # 103, Ex. 2 (emphasis added). Wilson also stated that "it should be susceptible of proof from official records that, prior to treatment, each individual patient, being in an understanding state of mind, was *clearly informed* of the nature of the treatment and its possible effects, and expressed his *willingness* to receive the treatment." *Id.* (emphasis added).

Wilson reiterated this position in a November 5, 1947 letter to Robert Stone of the UCLA Medical School in which Wilson quoted from the preliminary report of the Commission's Medical Review Board:

We believe that no substances known to be, or suspected of being, poisonous or harmful should be given to human beings unless all of the following conditions be fully met: (a) that a reasonable hope exists that the administration of such a substance will *improve the condition of the patient,* (b) that the patient gives his *complete and informed consent* in writing, and (c) that the responsible nearest of kin give in writing a similarly complete and informed consent, revocable at any time during the course of such treatment.

Dkt. # 103, Ex. 3 (emphasis added). In addition, a March 5, 1951 letter from Dr. Shields Warren ("Warren"), Director of the Commission's Division of Biology and Medicine, to Leslie Redman ("Redman") of Los Alamos National Laboratory repeated the above-quoted language from the Review Board's preliminary report in response to Redman's earlier letter "con-

cerning policies on human experiments." Dkt. # 94, Ex. M. Warren referred to these statements about therapeutic value and informed consent as the Commission's "guiding principles" in human experimentation. *Id.* These "guiding principles" were reflected in Brookhaven National Laboratory's application for admission, which informed patients that "[n]o treatments are employed except those which are designed for benefit of the patient and of other patients who suffer from similar conditions." Dkt. # 81, Ex. 21.

The United States argues that the Atomic Energy Act, which established the Commission, demonstrates the Commission's complete discretion in supervising medical research. Section 3 of the Atomic Energy Act provides that the Commission shall make arrangements to "protect health [and] to minimize danger from explosion and other hazards to life or property ... as the Commission may determine." Atomic Energy Act of 1946 § 3. This legislative language, however, merely "interweave[s] precatory with quasi-mandatory language...." *Irving v. United States,* 162 F.3d 154, 165 (1st Cir.1998). Accordingly, this Court may rely on "informal indicia," such as the letters and admission application mentioned above, to determine whether the conduct was in fact discretionary or a matter of policy. *Id.*

 The letters from Wilson and Warren evidence a Commission policy requiring patients' informed consent and allowing only experimentation with some reasonable expectation of therapeutic value. To the extent that the Plaintiffs allege that the BNCT experiments failed to comply with such policy, "the claim charges a failure on the part of the agency to perform its clear duty under federal law." *Berkovitz,* 486 U.S. at 544, 108 S.Ct. 1954. When a plaintiff charges an agency with failing to act in accordance with a specific mandatory directive, the discretionary function exception does not apply. *Id.; see also id.* at 536, 108 S.Ct. 1954 (the exception does not apply when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive.") (emphasis added). Accordingly, this Court rules that the United States is subject to suit under the Claims Act, notwithstanding the discretionary function exception.

### 2. *Is the Discretion Policy–Based?*

 Even if the issues of consent and non-therapeutic value were discretionary, the United States would still be subject to suit under the Claims Act because such discretion is not "susceptible to a policy-driven analysis." *Shansky,* 164 F.3d at 692. While "[v]irtually any government action can be traced back to a policy decision of some kind," *id.* at 693, the discretionary function exception only protects decisions made pursuant to *"legitimate* policy concerns," *id.* (emphasis added). The key inquiry here is whether the alleged conduct is "of the nature and quality that Congress intended to shield from tort liability." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. 2755. A review of factually analogous cases reveals that Congress did not intend to immunize the conduct alleged in this case.

In *Glickman v. United States,* 626 F.Supp. 171, 172 (S.D.N.Y.1985), the plaintiff alleged that the CIA subjected him to LSD experiments and electroshock therapy without his knowledge or consent. The court rejected the United State's discretionary function argument, noting that the exception "does not reckon with the extraordinary nature of the allegations made by [the] plaintiff in this case." *Id.* at 175. As the court stated:

What plaintiff is alleging is conduct of such a serious and malevolent nature as to be beyond any reasonable discretion on the part of a Government agency. Plaintiff is alleging something which does not involve normal regulatory activities or the weighing of policy factors within the scope of proper governmental

power, but rather something which goes beyond the constitutional powers of the Government, and seriously violates the constitutional rights of a citizen. It cannot be said that Congress meant to withdraw this kind of allegation from judicial scrutiny under the "discretionary function" exception. *Id.; accord Orlikow v. United States,* 682 F.Supp. 77, 81–82 (D.D.C.1988) (United States not immune from suit for CIA's alleged LSD testing on unwitting subjects because such "extraordinary and malevolent acts [are] by their very nature [ ] beyond any reasonable discretion" contemplated by Congress).

Courts have held that discretionary acts were not susceptible to policy-based analysis even in less outrageous circumstances. For instance, in *Andrulonis v. United States,* 952 F.2d 652 (2d Cir.1991), a bacteriologist in a state-run laboratory contracted rabies while conducting an experiment under the auspices of the Center for Disease Control ("the Center"), a division of the United States Department of Health and Human Services. A scientist from the Center observed the experiment. The government argued that it could not be held liable for its scientist's failure to warn the plaintiff about unsafe conditions in the laboratory because the decision to proceed despite the possible hazards was necessary to fulfill the Center's policy objectives.

The Second Circuit rejected the government's argument and held that the discretionary function exception did not shield the United States from liability. While recognizing that the government scientist was a high-level official with substantial discretionary authority to shape policy at the Center, the court concluded that "it is hardly conceivable that the [Center] would ever have a policy to keep silent about obvious, easily-correctable dangers in experiments using drugs supplied by the [Center]." *Id.* at 655. Moreover, "[t]he general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad and

indefinite to insulate [the scientist's] negligent conduct in the circumstances of this case." *Id.*

Likewise, the general policy of conducting radiation experiments for the sake of "the national interest," Dkt. # 93, at 15, does not suffice to immunize the United States from liability for the Brookhaven National Laboratory experiments. Just as the Second Circuit refused to believe that the Center would favor a policy of dangerous experimental conditions, *see Andrulonis,* 952 F.2d at 655, this Court rejects the contention that the Commission would favor a policy of injecting poison into the brains of unsuspecting cancer patients with no reasonable belief of therapeutic value. In fact, as discussed above, the Commission had a policy prohibiting this very conduct. *See* Dkt. # 103, Ex. 3.

Based on the above-cited cases, this Court concludes that the discretionary function exception does not shield the United States from liability for the Brookhaven experiments because even if the conduct alleged was discretionary, it was not based on legitimate policy concerns. *See Shansky,* 164 F.3d at 693. Because neither the independent contractor nor the discretionary function exceptions apply, the Court DENIES the United States' motion to dismiss for lack of subject matter jurisdiction.

## VIII. *Conclusion.*

For the foregoing reasons, the Court DENIES the United States' Motion to Dismiss (Docket # 91), GRANTS MIT's Motion for Partial Summary Judgment (Docket # 117), and GRANTS in part and DENIES in part the Brookhaven Defendants' Motion for Summary Judgment (Docket # 79) and Motion to Dismiss (Docket # 42), Mass General's Motion for Judgment on the Pleadings (Docket # 31), and MIT's Motion to Dismiss (Docket # 35).

Following these actions and those contained in *Heinrich I & Heinrich II,* the

remaining causes of action consist of: (a) constitutional *Bivens* claim (Count I) against all private defendants premised on all of the conduct challenged in the Complaint; (b) state law claims for fraud (Count II), failure to obtain informed consent (Count VII), wrongful death (Count VIII), negligence (Count X), and negligent misrepresentation (Count XI) premised on conduct that occurred in Massachusetts involving radiation treatments; and (c) Federal Tort Claims Act claims against the United States premised on all of the conduct challenged in the Complaint.

SO ORDERED.